ANTOINE MICHOUD, JOSEPH MARIE GIROD, GABRIEL MONTAMAT, FELIX GRIMA, JEAN B. DEJAN, AINÉ, DENIS PRIEUR, CHARLES CLAIBORNE, MANDEVILLE MARIGNY, MADAM E. GRIMA, WIDOW SABATIER, A. FOURNIER, E. MAZUREAU, E. RIVOLET, CLAUDE GURLIE, THE MAYOR OF THE CITY OF NEW ORLEANS, THE TREASURER OF THE CHARITY HOSPITAL, AND THE CATHOLIC ORPHAN'S ASYLUM, APPELLANTS, v. PERONNE-BERNARDINE GIROD, WIDOW OF J. P. H. PARGOUD, RESIDING AT ABERVILLE, IN THE DUCHY OF SAVOY, ROSALIE GIROD, WIDOW OF PHILIP ADAM, RESIDING AT FAVERGES, IN THE DUCHY OF SAVOY, ACTING FOR THEMSELVES AND IN BEHALF OF THEIR COHEIRS OF CLAUDE FRANÇOIS GIROD, TO WIT, LOUIS JOSEPH POIDEBARD, FRANÇOIS S. POIDEBARD, DENIS P. POIDEBARD, WIDOW OF P. NICOUD; JACQUELINE POIDEBARD, WIFE OF MARIE RIVOLET; CLAUDINE POIDEBARD, WIDOW OF P. F. POIDEBARD; AND M. R. POIDEBARD, WIFE OF ANTHELME VALLIER, AND ALSO OF FRANÇOIS QUETAND, JEAN M. F. QUETAND, MARIE J. QUETAND, WIFE OF J. M. AVIT; FRANÇOISE QUETAND, WIFE OF J. A. ALLARD; MARIE R. QUETAND, MARIE B. QUETAND; ALSO OF J. F. GIROD, JEANNE P. GIROD, WIFE OF CLEMENT ODONINO, F. CLEMENTINE GIROD, WIFE OF P. F. PERNOISE; AND JEAN MICHEL GIROD, DEFENDANTS.

A person cannot legally purchase on his own account that which his duty or trust requires him to sell on account of another, nor purchase on account of another that which he sells on his own account. He is not allowed to unite the two opposite characters of buyer and seller.

A purchase, *per interpositum personam*, by a trustee or agent, of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not, carries fraud on the face of it.

This rule applies to a purchase by executors, at open sale, although they were empowered by the will to sell the estate of their testator for the benefit of heirs and legatees, a part of which heirs and legatees they themselves were.

A purchase so made by executors will be set aside.

The decisions of the courts of several States, upon this subject, examined and remarked upon.

Relaxations of this rule of the civil law, which were made in some countries of Europe, were not adopted by the Spanish law, and of course never reached Louisiana. Nor were those relaxations carried so far as to allow a testamentary or dative executor to buy the property which he was appointed to administer.

The maxims and qualifications of the civil law, upon this point, examined.

Although courts of equity generally adopt the statutes of limitation, yet, in a case of actual fraud, they will grant relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or become known to the party whose rights are affected by it.

Within what time a constructive trust will be barred must depend upon the circumstances of the case, and these are always examinable.

Acquittances given to an executor, without a full knowledge of all the circumstances, where such information had been withheld by the executor, and menaces and promises thrown out to prevent inquiry, are not binding.

Michoud et al. *v.* Girod et al.

THIS case was brought up by appeal from the Circuit Court of the United States, for the Eastern District of Louisiana, sitting as a court of equity.

The widow Pargoud and others, defendants in this court, were complainants in the court below, and obtained a decree in their favor, from which the other parties appealed. They alleged, that a series of fraudulent transactions occurred, commencing in 1813, by which they had been deprived of their fair share of the estate of Claude François Girod, whose heirs they were, and that the chief agent in this fraud was Nicholas Girod, a brother of the deceased Claude François Girod, and also a brother of some of the complainants, and relative of the rest.

Claude François Girod was a resident of the parish of Assumption, in the State of Louisiana, and died in the month of November, 1813, leaving a last will and testament, dated on the 30th of November, 1812, and a codicil, dated on the 4th of November, 1813, which will was admitted to probate, with the codicil, on the 8th of November, 1813. He never was married, and left eight brothers and sisters, and the children of a predeceased sister. These surviving brothers and sisters, with the exception of Jacques, otherwise called Jacques Antoine Girod (who was excluded by the terms of the will), were the legal heirs of the deceased Claude François Girod, each for the one eighth part of his estate and the succession; and the heirs and legal representatives of the said predeceased sister, the legal heirs by representation of their deceased mother, for the remaining eighth part of the estate.

The proceedings in the case were exceedingly complicated. There was a bill, and an amended bill, and a supplemental bill, and another amended bill, and then another amended bill. Instead of pursuing the case through all these details, the simplest course will be to state the charges in the bill, and the documents brought forward to sustain them.

The will of Claude François Girod was as follows : —

"I, Claude François Girod, the legitimate son of François Silvestre Girod, deceased, and of the late François, born Dubois, native of Thône, in Savoy, diocese of Geneva, province of France, and now a resident of the parish of Assumption, on Bayou Lafourche, in the State of Louisiana, being about sixty years of age, and desirous to die in the Roman Catholic and Apostolic religion, under which I have ever lived, with a firm belief in the mysteries of our holy religion, do ordain this my last will or testament, in case I should be overtaken by death, the hour of which I am uncertain of ; and as it behooves all living beings to settle their temporal affairs, when they are in the full enjoyment of their health and reason, in order to avoid thereby the difficulties which arise when we are laboring under a dangerous disease, which takes from us the use of our reasonable faculties, and consequently deprives us of the

understanding and memory necessary to the faithful and peaceable settlement of our family affairs, with a view to avert from our heirs the difficulties always prejudical to those that are absent. Now, therefore, under these circumstances, I invoke the grace and clemency of God, to whom I recommend my soul when separated from my body ; and I wish and ordain, that the latter be buried among faithful Christians, with all the usual rites of our mother church, leaving with my testamentary executors, herein after named, the performance of all pious works, such as causing three masses to be said on my behalf to my holy patron, as also funeral services, masses, &c., &c.

"1. I declare that the property I am now possessed of are the earnings of my labor and savings, and consist of the following items, to wit : — Three houses and several lots situated in suburb St. Mary, above the city of New Orleans, and one in Chartres Street, now occupied by my brother, Nicolas Girod ; one main plantation, whereon I reside, situated in said Bayou Lafourche, with all the buildings, improvements, and appurtenances thereof, and being thirty-one and a half arpents front, together with the utensils, implements of husbandry, animals of all kind, and one hundred and odd slaves of different ages belonging to me ; also, a quantity of lands situated in the different parishes of the bayou, the titles to which I hold in my possession ; also, a certain sum of money is due to me, which I cannot ascertain at present, but which will be made to appear by the books and obligations in my power ; also, I am the owner of upwards of two hundred and seventy bales of ginned cotton, now in my stores ; also, I declare that I am indebted unto divers persons by obligations, and little by accounts, in a sum of about thirty thousand dollars.

"3. I give and bequeath to my parish of Thône, in Savoy, to have a solemn mass annually said on my behalf, and to contribute to the repairs of said church, a sum of two thousand dollars, such being my will.

"4. I give to the poor of my said parish, to be distributed among them so as to meet their most pressing wants, a sum of one thousand dollars, such being my will.

"5. I give and bequeath to the cousins, Dodos Gollié, of said parish, a sum of five hundred dollars, such being my will.

"6. I give and bequeath to the brothers and sisters, Joseph Suard, senior, and Antoine Suard, junior, sons of Antoine Suard, deceased, since about thirty years, residing at Cluse, in Fonsigny (Savoy), the sum of two thousand dollars, such being my will.

"7. I give and bequeath to my distant relations of said parish a sum of five hundred dollars, to be distributed among them, such being my will.

"8. I give and bequeath to the Charity Hospital of Thône, in Savoy, a sum of one thousand dollars, such being my will.

" 9. I give and bequeath to the children of my deceased sister, Françoise, wife of Poidebard, without prejudicing their rights in and to my succession, the sum of two thousand dollars, to be divided between them by equal portions, such being my will.

" 10. I give and bequeath to my sister Teresa, wife of Quetant, without prejudice to her rights in my succession, a sum of one thousand dollars, such being my will.

" 11. I give and bequeath to my god-daughter and sister, Rosalie, married at Talcire, her husband's name being unknown to me, a sum of one thousand dollars, without prejudice to her rights in my succession, such being my will.

" 12. I give for once to my brother James Girod, a sum of four thousand dollars, without any other rights or pretensions whatever in and to my succession, such being my last will.

" 13. I give and bequeath to my brother Claude, married, the sum of two thousand dollars, without prejudice to his rights in my succession, such being my last will.

" 14. I give and bequeath to the parish of Assumption, for the church-wardens in Lafourche, where I now reside, a sum of five hundred dollars, for contributing to the construction of a church, such being my will.

" 15. I give and bequeath to the mulatress Françoise Vils, for the faithful services she has rendered to me at my house, during a long space of time, a sum of six thousand dollars, which shall be paid to her (after my death) one, two, and three years, such being my will.

" 16. I give and bequeath to my god-daughter Françoise, a free colored woman, the daughter of Rosette, a negro woman, a sum of fifteen hundred dollars, such being my last will.

" 17. I give and bequeath to the mulatress Belanie, wife of Colas Meillen, a sum of two hundred dollars, such being my will.

" 18. I give likewise to her younger sister Polline, a sum of two hundred dollars, such being my will.

" 19. I give and bequeath to my mulatto slave Dominic, who is a blacksmith and rum-distiller, his freedom, which he shall be put in possession of six months after my death, for his good and faithful services to me.

" 20. I nominate for my testamentary executors th following persons, my brother Nicolas, who is my senior, and Jean François, my junior, the former being a merchant in New Orleans, and the second is a planter, residing at Washita, and in their default, Mr. Phillipon, senior, merchant at New Orleans, to whom I give, by the present olographic testament, full power and authority as required by law to take possession of all my property present and to come, to inventory, sell, and cause them to be sold, as to him will seem best for the heirs of all my brothers and sisters, present and absent, without intervention of justice, hereby annulling and de-

claring void. all other testaments, codicils, and donations, *mortis causa*, and other acts of last will which I may have made previous to and to the prejudice of the present, which is the only one I adopt as being my last will, in order that my heirs may inherit and enjoy my property with the benediction of God and mine, &c.

"Done and passed on my plantation, at Lafourche, the 30th of November, 1812.

   (Signed,)       C. F. GIROD.

J'h Courrie, *witness.*
Saint Felix, *witness.*

"Ne varietur ————"

"State of Louisiana, Parish of Assumption :

"*Monday, the 8th of November, in the year* 1813.

"At the request of Mr. Nicolas Girod, I, F. Corvaisier, judge of this parish, did repair to the plantation of the late C. F. Girod, where a bundle written over having been presented to me as the testament or last will of the said C. F. Girod, signed by him under date of the thirtieth of November, eighteen hundred and twelve, as also an open codicil signed by the deceased, in the presence of Messrs. Prevot, St. Felix, and François Bernard de Deva, I proceeded to the proof of said testament by swearing to that effect Messrs. St. Felix and J'h Courrie, witnesses to said testament, in the presence of Mr. Nicolas Girod, and then proceeded to open the same.

   (Signed,)     N. GIROD,
         J. L. COURRIE,
         SAINT FELIX BECHE,
           *Justice of the Peace.*
        F. CORREJOLLES, *witness.*
        F. CORVAISIER, *Judge.*

"And by the opening of said testament we saw that Messrs. N'as Girod and F'ois Girod, brothers of the deceased, were appointed testamentary executors.

   (Signed,)     F. CORVAISIER, *Judge.*"

There were four inventories made of the property of the deceased, namely : —

| | |
|---|---|
| November 12th, 1813. | In the parish of Assumption. |
| February 3d, 1814. | In the parish of Assumption. |
| February 18th, 1814. | In the parish of Assumption. |
| February 26th, 1814. | In the city of New Orleans. |

The amount of all these inventories was $ 124,594·45. In the fourth inventory was included the half of a house and lot at the corner of S⁺ Louis and Chartres Streets, in the city of New Orleans, whereas the complainants alleged that the whole of it be-

longed to the deceased, and ought to have been included in the inventory.

The bill then charged, that the executors plotted and contrived to obtain possession, for their own use; and benefit, and to the wrong and injury of their coheirs, of the entire succession and estate of their deceased brother, by virtue of the following proceedings, which were charged with being illegal and fraudulent, namely : —

On the 19th of January, 1814, the executors presented the following petition : —

" To the Honorable Fran's Corvaisier, Judge of the Court of Probates of the Parish of Assumption, Lafourche.

" The petition of Nicholas and Jean François Girod, both merchants, residing in the State of Louisiana, and testamentary executors of the late Claude François Girod, deceased, in the said parish, humbly showeth : —

" That their deceased brother, Claude François Girod, by his testament dated the 30th of November, 1812, has appointed them his testamentary executors and detainers of his estate, and, as such, given to them full power and authority to cause an inventory of all his property to be made, without intervention of justice, to sell or cause to be sold his property, in whole or in part, as to them will seem best for their own interests, and for those of the absent heirs named in said testament.

" Wherefore petitioners pray the honorable court to order, that the sale of the movables, movable effects, and of the main plantation, as also of the slaves of both sexes employed thereon, and other lands adjoining thereto, and making part thereof in the lifetime of the deceased, be made at public auction, for cash, as consisting in part of perishable objects, and for the purpose of paying the debts of the succession, after the usual delays, advertisements, and publications required by law.

" The 19th of January, 1814.
  (Signed,)                    N. GIROD,
                                *Testamentary Executor.*
                        JN. FS. GIROD,
                                *Testamentary Executor.*"

On the 16th of February, 1814, the following bond was executed : —

" Whereas, the honorable judge, François Corvaisier, thinks that he is not authorized to sell the several properties situated in the parish of Lafourche, interior, as being without the jurisdiction of his said parish ; and whereas we are desirous to remove all the liabilities which the said honorable judge might subject himself to, by selling said lands in the same manner, and at the same time, as those situated within his jurisdiction. Now, therefore, as testa-

mentary executors of the late C. F. Girod, we do bind ourselves, by these presents, to protect and warrant said honorable judge against all the troubles and difficulties which might be the consequence of his thus selling the lands of the succession situated out of this parish.

"In faith whereof, we have signed these presents, to be by him used as of right.   Parish of Assumption, the 16th of February, 1814.

(Signed,)            JN. FS. GIROD.
                     JN. FS. GIROD, *Executor.*"

On the 18th of February, 1814, a sale took place, as evidenced by the following paper : —

" State of Louisiana, Parish of Assumption, the eighteenth day of February, in the year 1814.

"On the day and year aforewritten, upon the request of the testamentary executors of the late C. F. Girod, I, François Corvaisier, judge of the said parish, did repair to the sugar-plantation of the deceased, and we there proceeded to the sale and adjudication (as requested), of the property, both movable and immovable, belonging to the succession, to wit : — "

(Then follows an enumeration of plantations, tracts of land, and personal property.)

"N. B.   A certain lot of ground situated at Donaldsonville, which, through error, was included in the original inventory, has not been sold, because it does not belong to the succession, but to one F'se Wiltz, a free woman of color.   And the present sale being concluded on the day and year aforewritten, we have closed these presents, amounting to the total sum of eighty-four thousand seven hundred and fifty-five dollars and forty cents, omissions and errors of calculations excepted.   And the witnesses, the last appraisers, and the parties interested, have signed, before the judge of the aforesaid parish of Assumption, on the 18th of February, 1814.

(Signed,)            JN. FS. GIROD, *Testamentary Executor,*
                     *for self, and by procuration of his bro-*
                     *ther, N'a's Girod.*
                     ETIENNE BOUDREAUY, *witness.*
                     JACQUES TERIOT,           *do.*
                     L. RICHE,                 *do.*
                     P. L. LAURET,             *do.*
                     FS. CORREJOLES,           *do.*
Ordinary mark of     PIERRE CANCIEL,           *do.*
                     JUAN VIVES,               *do.*
                     J. BERN'DO DE DEVA,       *do.*
" Before me,         F. CORVAISIER, *Judge.*"

QQ*

On the same day, namely, the 18th of February, 1814, the following judicial adjudication of the property was made, being in the nature of a deed : —

" State of Louisiana, Parish of Assumption, the 18th of February, 1814.

" At the request of the testamentary executors of the late C. F. Girod, J. F. Corvaisier, judge of the aforesaid parish and of the Court of Probates, did repair to the sugar-plantation of said deceased, where, the customary formalities being complied with, and the sale having been announced by the public crier, I proceeded, as requested, to sell at auction, and for cash, to the highest and last bidder, on account of said succession, or those interested therein, all the lands, slaves, and other property situated in this parish and county of Bayou Lafourche, to wit : — Thirteen tracts of land or plantations, cultivated or otherwise, including thereon the sugar-plantation [and] three small islands lying at the mouth of said bayou ; also one hundred and seventeen slaves, employed on said sugar-plantation, said slaves being of different ages and sexes, in good health, sick, infirm, crippled, and such as they are or may be, and no warranty being given to the purchaser against the redhibitory vices and maladies prescribed by law, said warranty being on the contrary absolutely and totally refused ; also a cotton-gin adjoining said sugar-plantation ; also a distillery in operation, with its implements and appurtenances ; also all the horned cattle, mules, horses, carts, and wagons ; also all the implements of husbandry of said sugar-plantation ; as also all the furniture [and] old silver plate ; also twenty-two hundred gallons of Tafrá, in the distillery aforesaid ; also fifty-five thousand pounds of brown sugar lying on cisterns ; also sixty-three bales of cotton (nine of which are damaged), weighing together twenty-three thousand one hundred and thirty pounds. All the above articles were sold separately, and cried by the public crier, with the exception of the sugar-plantation, which was sold, with the furniture thereof, as appears by the judicial sale, detailed and deposited in the clerk's office of the said parish of Assumption ; and the whole, amounting together to the sum of eighty-four thousand seven hundred and fifty-five dollars and forty cents, was adjudicated for cash to Mr. Charles Saint Felix, who is satisfied therewith, for having seen, visited, received, and taken possession of same. And the aforesaid Nas. Girod and Jn. F. Girod, here present, declare, by the present act, that they have received from the said Charles Saint Felix the aforesaid sum of $ 84,755·40, for which acquittance is hereby given, and that they quitclaim and release him, and his heirs and assigns, of and from all claims and demands whatsoever.

" In testimony whereof, the aforesaid parties have signed the

present judicial sale, the day and year first above written, in presence of the undersigned witnesses, and of the parish judge.

" Signed, per procuration of Nas. Girod, JN. F. GIROD.

JN. F. GIROD.

SAINT FELIX.

T. COURRIE.

" Witnesses, — F. CORREJOLLEES.

" Before me, J. CORVAISIER, *Judge.*"

On the 23d of February, 1814, by a similar deed to the above, Saint Felix conveyed the whole of the property to Nicholas Girod and Jean F. Girod, describing it in the language above quoted, and for the same consideration. The deed concludes in the following language : —

" All which articles, the said Saint Feli does, by these presents, retrocede to the said purchasers, Nas. Girod and Jean François Girod, for themselves, their heirs and assigns, without any reservation or reclamation whatever, for the price and sum of eighty-four thousand seven hundred and fifty-five dollars and forty cents, which the said vendor acknowledges, by these presents, to have received, in ready money, from the said purchasers, Nas. Girod and Jean Frs. Girod, and for which the present sale will operate as an acquittal and release against all and every person or persons whatever ; the said Saint Felix herein declaring, that he is not bound to furnish the said purchasers with any other titles for the said lands and slaves, than those which have been given and delivered to him at the judicial sale aforesaid, and which he now delivers to said purchasers, who acknowledge to have received them, and to be satisfied therewith. Wherefore, the contracting parties agreeing both to these presents, have set their names to the same, the day and year aforewritten, in the presence of the undersigned witnesses, and of the parish judge aforesaid.

(Signed,) NAS. GIROD, *per procuration.*

SAINT FELIX.

JN. F. GIROD.

JN. F. GIROD.

" Witness, — (Signed,) J. COURRIE.

Fs. CORREJOLLES."

On the 4th of March, 1814, the following petition was presented, and order given for the sale of the property in New Orleans.

" To the Honorable James Pitot, Judge of the Court of Probates, the petition of Nicolas and Jean François Girod, testamentary executors of the late Claude François Girod, humbly showeth :

" That, in conformity with the order rendered by this honorable

court, they have caused an inventory to be made by the register of said court of all the property left by the deceased in this parish, and amounting, according to the appraisement made thereof, to the sum of twenty thousand seven hundred dollars, being the amount of eight lots, and a piece of ground, situated in this city, at the corner of St. Louis and Chartres Streets, as the whole appears from said inventory deposited in the clerk's office of said court. Petitioners further show, that the succession of their late brother Claude François Girod is indebted in a sum of sixty thousand dollars, or thereabouts, being the amount of the legacies and debts left by the deceased, which it is necessary to pay without delay. Wherefore petitioners pray this honorable court to order that the said piece of ground and eight lots be sold for cash, as also the said house, which, belonging in common to the succession and one of the petitioners, cannot be conveniently divided without loss or inconvenience to the owners; and petitioners further pray that the present petition be served upon the attorney appointed to represent the absent heirs, so that the law be complied with, and justice will be done.

(Signed,)                       N. GIROD, *Mayor.*"

Copied from the original in English.

### Order.

"Let Mr. C. R. Caune, attorney appointed by the court to represent the absent heirs of said Claude François Girod, be notified to show cause why the prayer of this petition should not be granted.

(Signed,)                       JS. PITOT.

"New Orleans, March 3d, 1814."

"As attorney representing the absent heirs of the said late Claude François Girod, I have no objections to the petitioners' demand.

(Signed,)         R. CAUNE, *Attorney for absent heirs.*
"New Orleans, March 4th, 1814."

### Order.

"Let the sale be made as prayed for.
"New Orleans, March 5th, 1814.
(Signed,)                 JS. PITOT, *Judge.*"

On the 9th of April, 1814, a sale was made of the property in the city of New Orleans, in conformity with the above order, which was inventoried on the 26th of February, as appeared by the following paper.

"And on this ninth day of the month of April, in the year of our Lord one thousand eight hundred and fourteen, and of the

independence of the United States of America the thirty-eighth, at the hour of ten, A. M., I, Jean Baptiste Marc Brierre, deputy register of wills for the city and parish of New Orleans, did repair to suburb Saint Mary, for the purpose of selling to the highest and last bidder the houses and lots belonging to the succession of the late Claude François Girod, and there being, we did find and meet with Mr. Nicolas Girod, one of the testamentary executors of the deceased, and Charles Robert Caune, attorney at law, appointed by the court to represent the absent heirs. Whereupon, in their presence, and in that of Prosper Prieur and Sebastian Blondeau, witnesses hereto required, I did proclaim the said sale in a loud and audible voice, and on the following terms and conditions, to wit :—

## "Cash."

(The paper then enumerated the lots of ground, and concluded as follows.)

"And there remaining nothing else to be sold belonging to said succession, I, deputy register, aforesaid, closed and terminated the present process verbal. And after reading thereof, we ascertained the amount of said sale to be twenty-seven thousand seven hundred dollars, which sum was left by us in the hands of the said Nicolas Girod, testamentary executor aforesaid, who acknowledges the same, takes charge thereof, and has signed with the parties, the witnesses, and me, deputy register, the day, month, and year aforewritten.

(Signed,)  BLONDEAU.
PROSPER PRIEUR.
R. CAUNE, *Attorney.*
N. GIROD, *Testamentary Executor.*
BRIERRE, *Deputy Register* "

On the 28th of April, 1814, Laigne' conveyed to Nicholas Girod, as follows.

*Sale of House and Lots from Simon Laignel to Nicholas Girod.*

"Before me, Michel de Armas, a notary public, residing in New Orleans, State of Louisiana, United States of America, and in the presence of the witnesses hereinafter named and undersigned, personally appeared Mr. Simon Laignel, merchant, residing in suburb St. Mary, who has, by these presents, sold, transferred, and conveyed, from this day and for ever, with no other warranty than that of his own acts and deeds, unto Mr. Nicolas Girod, of this city, merchant, here present and accepting purchaser for himself, his heirs and assigns.

"1st. Six lots of ground," &c., &c., enumerating the lots, and concluding as follows :— "To have and to hold said property

unto the said purchaser, who may use, enjoy, and dispose of the same, in full and complete ownership, by virtue hereof. The property herein sold and described belong to the vendor, for having acquired the same at the public sale which the said Nicolas Girod, as testamentary executor of the late Claude François Girod, caused to be made on the 9th of April, instant, by the register of wills, of the property belonging to said Claude François Girod's succession, as the whole appears by the act of sale confirmatory of the adjudication aforesaid, passed before the notary undersigned on the 25th instant. By the certificate of the recorder of mortgages in this city, bearing even date herewith, it appears that there is no mortgage in the name of the vendor on the property herein bargained and sold.

" The present sale is made for and in consideration of the total sum of thirty-five thousand eight hundred dollars, which the said vendor acknowledges to have received cash, before the signing hereof, and out of the presence of the notary and witnesses undersigned, from the purchaser, to whom he grants full and ample acquittance and release of the same, renouncing the benefit of the exception, *non numerata pecunia,* and the two years' delay which the law accords to enforce said exception. Thus it was, &c., promising, obliging, renouncing, &c.

" Done and passed at New Orleans, in my office, in the presence of Messrs. Michel J. B. L. Fourcesy and Charles Robert Caune, both witnesses hereto required and domiciled in this city on the twenty-eighth of April, in the year eighteen hundred and fourteen, and of the independence of America the thirty-eighth; and the said appearers, notary, and witnesses, have signed these presents, after reading thereof.

(Signed,) N. GIROD,
SIMON LAIGNEL,
FOURCESY,
R. CAUNE,
MICH'L DE ARMAS, *Not. Pub.*"

The bill of the complainants in the court below also charged, that the executors, in order to appropriate, wickedly and fraudulently, to their own use and benefit, the funds of the succession, did, in their account of the 23d of May, 1817, place themselves as creditors of said succession for a sum of nearly forty-nine thousand dollars, to wit, said Nicholas Girod for forty thousand four hundred and eighteen dollars and nine cents, and said Jean François Girod for eight thousand two hundred and fifty-three dollars and twenty cents, although no sum was due to them.

The proceedings upon which this charge was founded are as follows : —

Michoûd et al. *v.* Girod et al.

" STATE OF LOUISIANA :

" NICHOLAS GIROD

*v.*

J. F. GIROD, Executor of C. F. } No. 604. — Parish court.
Girod, and R. C. Caune, &c.

" *Petition, filed November 26th*, 1814.

" To the Honorable James Pitot, Judge of the Parish Court for the Parish and City of New Orleans.

" The petition of Nicolas Girod, of the said city and parish, merchant, showeth, that Claude Francis Girod, of Lafourche, was indebted to your petitioner in a large sum of money, previous to his decease ; "that hereto annexed is a detailed account of the money due by his estate, at this time, to your petitioner ; which account, amounting to the sum of forty thousand five hundred and seventy-seven dollars and twenty cents, principal [and] interest, the executors of the said Claude F. Girod has refused to pay, though thereto frequently required. Wherefore your petitioner prays, that John Francis Girod, now residing in the city of New Orleans aforesaid, one of the executors of the said Claude F. Girod, and R. C. Caune, the attorney appointed to represent the interest of the absent heirs, may be cited to appear and answer this petition.

" And your petitioner further prays, that they may be condemned to pay your petitioner the above sum of $40,577.20, with interest and costs.

" And your petitioner further prays all such other relief as the case may require, and to justice and equity may appertain.

" Received the annexed document, New Orleans, September 9th, 1816.

(Signed,) -N. GIROD.

" A copy thereof being annexed to the award of the arbitrators in the premises.

" *Citation.*

" Mr. J. F. Girod, Executor of C. F. Girod, and C. R. Caune :

" You are hereby summoned to comply with the prayer of the annexed petition, or to file your answer thereto in writing with the clerk of the parish of Orleans, at his office at New Orleans, in ten days after the service hereof ; and if you fail herein, judgment will be given against you by default.

" Witness the Honorable James Pitot, judge of the said court, this 26th day of November, in the year of our Lord 181

(Signed,) SAM. P. MOORE, *Deputy Clerk.*

" *Sheriff's Return.*

" Served a copy of petition and citation on each [of]

defendants, November 28th, 1814 ; returned November 28th, 1814.

J. H. HOLLAND, *Deputy Sheriff.*

"*Answer of J. F. Girod, filed November 29th*, 1814.

" To the Honorable James Pitot, Judge of the Court for the Parish and City of New Orleans, the answer of Jean F. Girod, one of the testamentary exec̃utors of the late C. F. Girod, to the petition of Nicholas Girod, humbly showeth :

" That all and singular the items in the accounts presented by said Nicholas Girod, in his said petition, must be proved, to justify his claim against the succession of C. F. Girod, and for that purpose this respondent prays this honorable court to order what shall seem the best for the common interest of parties, and moreover to be hence dismissed with costs. And, &c.

(Signed,) J. F. GIROD, *Ex., Jr.*

" *Answer of R. Caune, filed November 29th*, 1814.

" To the Honorable James Pitot, Judge of the Parish Court, the answer of C. R. Caune, in his capacity of attorney representing the absent heirs of the late C. F. Girod, to the petition presented by Nicholas Girod, against the estate of the late aforesaid C. F. Girod :

" Your respondent denies all facts mentioned in the plaintiff's petition, and he says that the plaintiff must be proven his claim before court, and prays the court to dismiss him, with costs of the suit ; in duty bound, your petitioner shall ever pray.

(Signed,) R. CAUNE, *Attorney.*

" *Order appointing Arbitrators, Parish Court for the Parish and City of New Orleans, November 27th, 1814.*

" Present : the Honorable James Pitot.

"NICOLAS GIROD *v.* J. F. GIROD, Ex. of C. F. Girod, and C. R. Caune, attorney for the absent heirs.

" Upon motion of Alfred Hennen, esquire, of counsel for the plaintiff, it is ordered that F. Percy and F. M. Rouzan be appointed arbitrators in this case, to decide on the claim of the plaintiff, and in case of their not agreeing, that the court appoint a third person as umpire. I do hereby certify the above.

" In testimony whereof I have hereunto set my hand and affixed the seal of the said court at the city of New Orleans, the day and year first above written, and of the independence of the United States the thirty-ninth.

(Signed,) SAM. P. MOORE, *Deputy Clerk* (swearing).

" Personally appeared before me, one of the justices of the peace in and for the city and parish of New Orleans, Ferdinand

Michoud et al. *v.* Girod et al.

Percy et F. M. Rouzan, of this city, who were duly sworn according to law as arbitrators as above named, that they will examine the accounts between the parties with impartiality, and give the report according to law.

(Signed,)    F. MEFFER ROUZAN.
            F. PERCY, Jun.

"Subscribed and sworn to before me, at New Orleans, the 10th day of December, 1814.

(Signed,)    J. L. LAPANSE, *Justice of the Peace.*

"The undersigned arbitrators, appointed by a decree of the honorable the court of the city of New Orleans, under date of the 25th of November last, to verify and examine the accounts and demands of Nicolas Girod, a merchant residing in New Orleans, against the succession of the late Claude François Girod, his brother, who was a resident of the parish of Lafourche, in this State, said succession being represented by Jean François Girod, one of the testamentary executors thereof, and C. R. Caune, attorney for the absent heirs, and to make a report thereon to said honorable court, do declare, under the sanctity of the oath they have taken, on the tenth of December instant, and which is hereto annexed, that after hearing the parties interested in this affair, and the witnesses by them introduced, after being sworn by John L. Laparge, a justice of the peace in this city, they have proceeded to the examination and verification of the documents, titles, accounts, and books exhibited to them by the parties interested in the manner following, to wit: — First, they have examined the sworn account produced by Nicolas Girod, on the 25th of November last, which consists of thirteen items, which the arbitrators have verified in the manner following.

The first item, amounting in capital to $ 1,602 for 801 hides, which the said Nicolas had left in the stores of Claude François Girod, is established by the declaration of Jean François Girod, who affirms positively that the said 801 hides had been left in the stores of said Claude François Girod, who disposed of the same for his private account ; the said Jean François Girod declares likewise, that two dollars was the price for hides in 1794, and that he himself had purchased some at that price for his own account  .  .  .  .  .  .  .  .  $ 1,602 00

The second item, amounting in capital to $ 1,500, is the produce of an account which Mr. Pierre Bousignes, then clerk of the house of Claude F. Girod, had collected and paid in the hands of said Claude F. Girod, as making part of the funds

belonging to Nicolas Girod. Mr. Bousignes declared under oath, that he does not remember the precise amount of that sum, but that it must have been something like fifteen hundred dollars ; he recollects that that account was paid in before the fire of 1794, and that several cash payments for the private account of C. F. Girod were made out of the funds belonging to said Nicolas Girod. . $ 1,500 00

The third item, amounting in capital to $ 6,222·18, proceeds from the following remittances and effects, to wit : Jean François Girod paid in specie to Claude François Girod, Nicolas Girod's interest, say two thirds in a shipment of furs made in March, 1795, on board the brig Jane, bound to Philadelphia, and amounting to $ 3,593·37, as appears from a copybook or register, marked A, No. 40, written by Guilhempan, and signed by the said Claude François Girod, which book or register has been produced by the said Jean François Girod, who further declared, that the said Claude François Girod was at that time authorized to settle the accounts of Nicolas Girod with this deponent, and that the said C. F. Girod has never rendered to Nicolas Girod an account of this transaction . . . . 2,395 63

For so much paid by Jean François Girod to said Claude François Girod, for Nicolas's interest, say two thirds in another shipment of furs made in April, 1795, on board the brig L'Archedimoi, bound to Philadelphia, as appears from the aforementioned copy-book or register, marked A, No. 40. . . 432 75

For the amount of a barrel of wine, with which the private account of said C. F. Girod was debited on the 17th of October, 1795, but never since credited with, as appears from the aforementioned copy-book or register, . . . . . . . 50 00

Amount of a bill of exchange drawn by Claude François Girod, on the 7th of April, 1796, payable eight days after sight, at New York, to his brother, Nicolas Girod, for $ 2,000, which he had received from Jean François Girod, *for $ 2,000, which he had received from Jean François Girod ;* said bill has never been accepted or paid, as appears from the bill itself, which has been exhibited to us by said Nicolas Girod, . . . . . . . 2,000 00

For the half of the amount of twenty-six barrels of gunpowder, shipped in the month of April, 1796, on board the ship The Two Friends, bound to New

York, and consigned to Th. Thebane, by Jean François Girod, on joint account with Nicolas Girod. The proceeds whereof, amounting to $ 1,193·75, as appears from the copy-book aforesaid, were received, as also the profits of said Th. Thebane by the said Claude François Girod, who never accounted for them to the parties intere ted.   This being established by the declaration of said Jn. F. Girod,   .   .   .   .   .   .   .   . $ 596 87

Amount of sundry merchandises belonging to Nicolas Girod, and by Jean François Girod intrusted to Claude François Girod, as appears from the copy-book aforesaid, which was exhibited to us by said Jean François Girod, who declared that Claude François. Girod had never accounted for the merchandise to said Nicolas Girod,   .   .   .   . 210 06

Amount of sundry debts which Claude François Girod had undertaken to collect for account of Nicolas Girod, as appears from the statement produced by Jean François Girod, and corroborated by the aforesaid copy-book or register A,   .   .   .   . 476 87

Amount of a barrel of wine, sold to Mr. de Vangine, by the said Jn. François Girod, which was paid to said Claude François Girod, as is proven by a written declaration of said Jn. F. Girod in said copy-book or register,   .   .   .   .   . 60 00

The 4th item, amounting in capital to $ 186, is established by the declaration of Jean François Girod, who affirms that it is within his knowledge that the articlest composing said item were delivered to Claude François Girod, who shipped them for Havana on his private-account,   .   .   .   . 186 00

The 5th item, amounting in capital to $ 651·50, consists of the net proceeds of the sale made by Claude Frs. Girod of 2 bales of blue drilling, shipped for New York in 1801, on board of the ship South Carolina, Stick, master, by Thibaut, for account of Nicolas Girod, and consigned to Claude F'ois Girod, as appears from book No. 1, which was exhibited to the arbitrators, who ascertained that it was in the handwriting of Guilhempan, then the clerk and agent of C. F. Girod,   .   .   .   .   . 651 50

The 6th item, amounting in capital to $ 229·06, consists likewise of the net proceeds of the sale of a cask of manna, shipped by Nicolas Girod when in New York, in 1797, on board of schooner Despatch, Clark, master, to the consignment of said Claude

François Girod, as the whole was made to appear by copy-book No. 1, mentioned in the foregoing article, . . . . . . . . $ 229 06

The 7th item, amounting in capital to $ 379·12, consists of a lot of merchandise, consigned by Jean François Girod to Claude François Girod, at the time of said J'n F. Girod's departure for the United States in 1797, which said merchandises belonged to said Nicolas Girod, and were sold by said Claude François Girod, as appears from a waste or copy-book, in the handwriting of said Guilhempan, marked B, No. 42, and produced by said Jean François Girod, . . . . . . 379 12

The 8th item, amounting in capital to $ 813·82, consists of the proceeds of the sale made by Claude Frs. of divers merchandises belonging to Nicolas Girod, which the latter had left in the hands of Jean François Girod, who delivered them in kind to Claude François Girod at the time of said J. F. Girod's departure for the United States, in 1797 ; said merchandises are enumerated in a copy or wastebook in the handwriting of the late Guilhempan, marked B, No. 41, and likewise produced by the parties interested, . . . . . . 813 82

The 9th item, amounting in capital to $ 899, consists of the net proceeds of twelve barrels of wine shipped by Nicolas Girod when in New York, 1797, on board the brig Success, Dinsmore, master, to the consignment of Claude François Girod, who sold the same, as was shown by the sales-book No. 1, aforesaid, . . . . . . . . 899 00

The 10th item, amounting in capital to $ 489·63, consists also of the net proceeds of sale made by Claude F'ois Girod, of 498 sextains of cards shipped by N'as Girod when in New York, in 1797, on board of the brig Success, Rathbone, master, to the consignment of said Claude F'ois Girod, as was shown by the sales-book No. 1, aforesaid, . . . . . 489 63

The 11th item, amounting in capital to $ 991·38, consists also of the net proceeds of the sale made by C. F. Girod of 762 sextains of cards, shipped in 1795 by Nicolas Girod, then in New York, for his account and risks, on board the schooner Active, Wilcox, master, and consigned to said Claude Frs. Girod, as appears from the sales-book No. 1, aforesaid, . . . . . . . . 991 38

The 12th item, amounting in capital to the sum of

Michoud et al. *v.* Girod et al.

$ 13,901·94, consists of divers lots of merchandises
and jewelry belonging to N. Girod, which the said
Claude François Girod. sent into the provinces of
the interior, and there sold, or caused to be sold.
The accounts of those sales were never settled be-
tween Claude François and Nicolas Girod, which
fact is attested by the declaration of Jean François
Girod, and several other witnesses, who testify that
Claude Frs. Girod has constantly avoided to render
said account. The several articles composing the
present item are enumerated and detailed in the
aforementioned sales-book No. 1, which the arbitra-
tors have ascertained to be in the handwriting of
Guilhempan, . . . . . . $ 13,901 94

The 13th item, amounting in capital to $ 6,574·30,
consists of the balance of an account between Nico-
las and Claude F. Girod, adjusted on 1st August,
1813, by Mr. Phillippon, jr., who was authorized
for that purpose by the said Claude F. Girod.
The arbitrators, after examining that account and
the one preceding it, are satisfied that the articles
mentioned in said accounts are foreign to the affairs
which existed between the said Nicolas and Claude
Frs. Girod, . . . . . . . 6,574 30

$ 34,439 93

Secondly. The arbitrators have examined and veri-
fied the account of interests also making part of the
claims of said Nicolas Girod, as follows, viz. : —

Interests on $ 1,602, amount of the first item of the
account produced by Nicolas Girod, from Novem-
ber, 1794, to the date, hereof, making, in all, 20
years, at 6 per cent. per annum, . . . . $ 1,922 40

Interests on $ 1,500, amount of the 2d item, from the
year 1794 to the date hereof, that is, 20 years, at 6
per cent. per annum, . . . . . . 1,800 00

Ditto, on $ 6,222·18, amount of the 3d item ; the ar-
bitrators have examined the eight parts whereof this
item is composed, and found that the interests cal-
culated on each part amounted to $ 7,087·92,
wherefore they have been of opinion to leave the
item as it was presented, . . . . 6,657 51

Ditto, on the $ 186, amount of the 4th item, from
January, 1797, to this day, making 17 years, 10
months, at 6 per cent. per annum, . . . 199 02

Ditto, on $ 651·50, amount of the 5th item. The ar-
bitrators have reduced the amount claimed, to wit,

Michoud et al. *v.* Girod et al.

$ 664·02, to $ 504·91, because the interests ought to have been calculated only from the 1st of January, 1802, when the 2 bales of drilling shipped by Thibaut, were sold; — this gives 12 years and 11 months, at 6 per cent. per annum, . . . . . $ 504 91

Ditto, on $ 229·06, amount of the 6th item. The arbitrators have verified the calculation, which they have found correct, . . . . . . 233 58

Ditto, on $ 379·12, amount of the 7th item. The calculation was verified, and found correct, . . 382 78

Ditto, on $ 813·82, amount of the 8th item. The calculation was verified, and found correct, . . 817 90

Ditto, on $ 899, amount of the 9th item. The calculation was examined, and found correct, . . 876 52

Ditto, on $ 489·63, amount of the 10th item; after examination, found correct, . . . . 477 75

Interests on $ 991·38, amount of the 11th item; examined, and found correct, . . . . 966 22

Ditto, on $ 13,901·94, amount of the 12th item; examined, and found correct, . . . . 12,998 30

Ditto, on $ 6,574·30, amount of the 13th and last item of the account presented by Nicolas Girod. The arbitrators, after examining the calculation, found that it fell short of what it ought to have been, but as the difference is trifling, and in favor of the heirs, they left the item as it was presented, . . . 493 06

Capital and interests due, after examination, . . $ 62,769 98

The arbitrators next proceeded to verify and examine the sums with which the said Nicolas Girod has credited the account he has produced, which sums amount, in capital and interests, to $ 22,351·89, and were found correct, . . . . . 22,351 89

Balance in favor of Nicolas Girod, . . $ 40,418 09

" So that the balance in favor of Nicolas Girod is reduced to $ 40,418·09 instead of $ 40,579·20, as claimed in his account, this difference being produced by the reduction made on the interests of the 5th item of said account. The arbitrators, after having examined and heard the declarations of Messrs. Pre. Bousignes, M. Pacaud, Joseph Guillot, and Jean François Girod, witnesses introduced by the parties, and sworn by John S. Lapauze, a justice of the peace, who positively assert that Claude François Girod has always refused to settle his accounts with his brother, Nicolas Girod, and after a scrupulous examination of the books, accounts, titles, and other documents which were produced in this

affair, are of opinion that the sum of forty thousand four hundred and eighteen dollars and nine cents, claimed by said Nicolas Girod, is lawfully due to him. In faith whereof, we have signed the present award, that it may have its legal effect given to it.

" New Orleans, this fourteenth day of the month of December, eighteen hundred and fourteen.

(Signed,) F. MEFFRE ROUZAN,
F. PERCY, Jun'r."

" On this, the twelfth day of the month of December, 1814, in the thirty-ninth year of the independence of the United States of America, before me, one of the justices of the peace for the city and parish of New Orleans, personally appeared, as requested by the parties, Mr. Joseph Guillot, a witness in the case of Nicolas Girod *v.* Jean François Girod, one of the testamentary executors of the late Claude François Girod, and Charles Robert Caune, attorney for the absent heirs, who, being duly sworn according to law, declared and said, that he has always been a friend of the Girods, and that some time in the month of July, 1813, the late Claude François Girod, being in town, came to deponent's house, and requested him to call upon him in his room, saying that he had something to confide to him ; and that having repaired thither, said Claude Francois Girod communicated his *intentions* of preventing all difficulties after his death, saying that he was desirous to settle with his brother Nicolas, that he had been to church, where he had knelt before the Holy Virgin, beseeching her to assist him in terminating his affairs with his said brother Nicolas ; deponent, knowing nearly all their affairs, asked him in what manner he intended to settle them ; then the said Claude François Girod told him, — Here are my propositions ; I will sell my house in St. Louis Street for cash to my said brother Nicolas, with a view to settle with him, reserving, for the term of my natural life, the use of one of the back rooms of said house ; and if there be any balance remaining due to him, he will grant me a delay to pay the same ; — and he requested deponent to submit those propositions to Nicolas Girod's consideration, which deponent did ; but the said Nicolas Girod answered him surely, No ; and added, that he requested deponent not to interfere in that affair, saying that he himself had made proposals to Claude Francois Girod, his brother.

" Deponent further says, that he knows well that said affairs between Nicolas and Claude Francois Girod were never settled ; and he has signed with us.

(Signed,) JN. FRS. GIROD, *Test'y Executor.*
JOSH. GUILLOT.
N. GIROD.
R. CAUNE, *Attorney for absent heirs.*

" Sworn to and subsc'bed before me, at New Orleans, this 12th day of December, 1ₒ14.

(Signed,)    JH. L. LAPANGE, *Justice of the Peace.*"

*Order, 15th December, 1814.*

" NICHOLAS GIROD,
        v.
JEAN FRANÇOIS GIROD, Ex. of C. F. } 604.
Girod, and C. R. CAUNE, Att'y, &c.

" Upon motion of Alfred Hennen, Esq., counsel for the plaintiff, and upon reading and filing the report of the arbitrators appointed in this case, it is ordered, that the defendants do show cause on Saturday next, the 17th instant, if any they have or can, why the said report should not be homologated, and made the judgment of this court in the premises."

*Sheriff's Return on Copy of the above Order.*

" Served copy of the within order on each of the defendants, December 15th, 1814.

(Signed,)        J. H. HOLLAND, *Deputy Sheriff.*"

*Order and Judgment.*

" It is ordered, that the report of the arbitrators be homologated, and made the judgment of the court in this case, and that the said defendants do pay to plaintiff, in conformity to the said award, the sum of forty thousand four hundred and eighteen dollars and nine cents, with costs of suit to be taxed.

" *New Orleans, May 6th,* 1815.

(Signed,)                J. PITOT, *Judge.*"

" I do hereby certify this to be a true copy of all the records, documents, and proceedings had in this case. Clerk's office of the Parish Court, New Orleans, January 10th, [SEAL.] 1844.

(Signed,)        ALFRED BODIN, *Deputy Clerk.*"

In the preceding March, Jean François Girod had brought in an account against the succession, and passed it through a similar process, which resulted in a judgment in his favor for the sum of $8,253·20.

The bill of the complainants in the court below then charged, that nearly all the coheirs, having full faith and confidence in the honesty and integrity of Nicholas and Jean François Girod, did intrust them with their powers of attorney, authorizing them to represent the interests of such coheirs in the settlement of the succession; in virtue of which the executors approved the account rendered by themselves. And that afterwards, by concealment of facts which they knew to exist, and were bound, as agents, to communicate, the

said executors obtained from some of them an acquittance or transfer of all claims against the succession.

The bill then recited that Nicholas Girod had died, in possession of all the real estate of Claude François Girod except some parts which were mentioned as having been sold, all of which property thus remaining with Nicholas Girod the complainants claimed as the original coheirs of Claude François Girod, and also an account of the rents and profits. All claim against the other executor, Jean François Girod, was released.

Amongst the matters introduced in evidence was the following letter, which is inserted because it is referred to in the opinion of the court; and was sent by Girod at the same time that he obtained from his two sisters the receipts which are mentioned in another part of this statement.

"*New Orleans, 27th May,* 1817.

"My sister Quetend : — To-morrow, our brother Jean François embarks for Havre ; from thence he will proceed home, for the purpose of delivering to each one of you what is coming to him from the succession of our late brother, Claude François. I assure you, that if I had not been anxious to protect the honor of this brother, every thing would have been absorbed in settlement of accounts with me, and by other debts ; besides, whether you have it now or later, the greater part cannot escape you ; — this is to be understood of those who shall not cease to merit our friendship and esteem. Beware not to imitate the example of Jacques, who has for ever lost our regard by his iniquities toward our whole family. Hereafter, when I shall have, in some measure, recovered from my losses by different bankrupts, I will send you some assistance from time to time. At present J. F. has orders to regulate his conduct towards you all by your conduct towards him. Farewell.

"I cordially embrace you all.

"Your brother and friend,

(Signed,)        N. GIROD.

"I have not time to write to you more at length, having much to attend to before the departure of my brother."

The original is indorsed : —

"Recorded in consular book G, page 94.

"*Paris, 22d January,* 1844.

(Signed,)     LORENZO DRAPEZ, [SEAL.]

Consul *United States.*"

Proved and admitted in evidence, April 29th, 1844.

On the 19th of January, 1830, Jean François Girod executed to his brother and co-executor, Nicholas, the following deed.

"On this nineteenth day of the month of January, of the year

eighteen hundred and thirty, and of the independence of the United States of America the fifty-fourth, before me, Louis T. Caire, a notary public in and for the parish and city of New Orleans, duly commissioned and sworn, and in the presence of the witnesses hereinafter named and undersigned, personally appeared Mr. Jean François Girod, junior, residing at Paris, in the kingdom of France, and now in this city, herein acting for himself and in his own right, of the one part, and Mr. Nicolas Girod, his brother, residing in this city, and herein acting for himself, and in his own right, of the other part, who declared that they own, in common, for a moiety each, several landed properties, and, among others, a sugar-plantation, situated on Bayou Lafourche, parish of Assumption, in this State, which they have for several years cultivated as partners, the said Nicolas Girod having the exclusive administration of the same, and being clothed with the necessary powers to that effect ; but that from the date hereof the partnership between them is amicably dissolved, by consent of both parties.

" And the said Jean François Girod moreover declared that . sells, abandons, transfers, and sets over, without any other warranty than that arising of his personal acts and deeds, but with substitution and subrogation to all the warranties which have been given to them by their original vendors, unto the said Nicolas Girod, his brother, here present, and accepting purchaser, for himself, his heirs and assigns : —

" 1. The undivided moiety of a sugar-plantation, seven leagues distant from the River Mississippi, situate on Bayou Lafourche, in the parish of Assumption, as it now is, or may be; together with the undivided moiety of the improvements, slaves, animals, ameliorations, implements of husbandry, and all other objects or things whatever appertaining thereto.

" 2. The undivided moiety of all the lands belonging to them in common, and situated on Bayou Lafourche.

" 3. The undivided moiety of three islands lying at the mouth of said Bayou, and known as Timballier, Bross, and Caillon islands.

" The whole of which had been acquired, on joint account, by the said appearers, by purchase from the late Joseph St. Felix, as per act executed before F. Courvaisier, judge of the aforesaid parish of Assumption, on the eighteenth of February, eighteen hundred and fourteen, the said St. Felix had purchased the same at the judicial sale of the property belonging to the succession of the late Claude François Girod, who in his lifetime had acquired the same by purchase from divers persons ; the said purchaser acknowledging that he is fully satisfied with the said titles, and declaring that he is well acquainted with the said plantation, lands, animals, slaves, and improvements, which are the subject-matter of this act, and requires nothing further.

" But it is well understood and agreed upon, by and between the

parties hereto, that the sugar and molasses now on said plantation and in the sugar-house are not' included in this sale, and that the net produce thereof shall be equally divided between the parties.

" And the said Jean François Girod moreover declared, that he also transfers and abandons, unto the said Nicolas Girod, his brother, all and singular the debts due to said plantation, as also all such sum or sums as now are, or may hereafter be, due to said partnership or community, under what title, and for what reason or reasons soever, hereby giving unto his said brother full power and authority to sue for and enforce the payment thereof, but without recourse against the transferer.

" The present sale and transfer of debts are made and accepted by the contracting parties for and in consideration of the price and sum of seventeen thousand dollars, in payment whereof the said purchaser, Nicolas Girod, has presently subscribed to the order of the said Jean François Girod, his brother, three promissory notes, each for a like sum of twenty-three thousand three hundred and thirty-three dollars thirty-three and one-third cents, the first payable on the first of March, eighteen hundred and thirty-one, the second on the first of March, eighteen hundred and thirty-two, and the third on the first of March, eighteen hundred and thirty-three, with power and faculty, however, to postpone the payment of said notes, or of parts thereof, from year to year, by paying to the said Jean François Girod, or to the holder of the notes the payment whereof shall have been postponed, a yearly interest, at the rate of eight per centum per annum, until final payment ; which said notes, after being marked *ne varietur* by the notary undersigned, to identify them herewith, were handed over to the said Girod, who acknowl-edges the receipt thereof, and gives full and ample acquittance for the same.

" By means of the foregoing, but provided the aforesaid notes be paid, the said Jean François Girod transfers and abandons unto the said Nicolas Girod all the rights of ownership whatever which he had, has, or may have, in and to the plantation, lands, slaves, animals, implements of husbandry, in a word, in and to all the property which they owned in common, wishing that the said Nicolas Girod be seized of the same, and may enjoy, use, and dispose thereof, as of things to him well and lawfully belonging, from this day and for ever.

" And the said appearers have furthermore declared, that by act before G. R. Stringer, a notary in this city, bearing date the fifteenth of May, eighteen hundred and twenty-nine, Mr. Nicolas Girod, acting for himself, and in the name and with the consent of his brother, sold to Messrs. Abner Robinson and Benjamin Ballard a tract of land situated in the parish of Assumption, and belonging to the community aforesaid, for the price of fifteen thousand dollars, five thousand whereof were paid cash, and converted to

the use of said sugar-plantation and other property ; that the ten thousand dollars payable at one, two, and three years from the date of the act aforesaid belong to them for a moiety each, but that the said Jean François Girod assigns to Nicolas Girod his share of five thousand dollars in said debt, on condition that the latter shall credit his running account with a sum of twenty-five hundred dollars, as for money had and received, and without recourse to the assignor, who moreover transfers to said Nicolas Girod, without exception or reservation any, all the rights, actions, privileges, and mortgages accessory to the aforesaid debt of five thousand dollars, being the transferer's share in the price of the sale aforesaid.

" And the notary undersigned having made known to the parties hereto article 3,328 of the new civil code of Louisiana, which reads as follows : — ' Every notary who shall pass an act of sale, mortgage, or donation, of an immovable or slave, shall be bound to obtain from the office of mortgages of the place where the immovable is situated, or where the seller, debtor, or donor has his domicile, if it be of a slave, a certificate declaring the privileges or mortgages, which may be inscribed on the object of the contract, and to mention them in his act, under penalty of damages towards the party who may suffer by his neglect in that respect,' they, the said parties, declared, that, as tenants in common, they are fully aware of the state of things in relation to the immovables and slaves, object of this sale, and that they do hereby, jointly and separately, relieve and free the notary undersigned from all liability on that subject.

" Done and passed in my office, at New Orleans, the day, month, and year first above written, in the presence of Messrs. Charles Darcantel and Jose Antonio Bermudez, witnesses hereto required, and domiciled in this city, who have signed with the said appearers and me, notary, after reading hereof.

(Signed,)          JN. FS. GIROD.
                     N. GIROD.
                     CHARLES DARCANTEL.
                     J. ANTONIO BERMUDEZ.
                     LOUIS T. CAIRE, *Notary Public.*"

About the 1st of September, 1840, Nicholas Girod died, in New Orleans, leaving the following will : —

" *Will of Nicolas Girod.* — Filed 30th January, 1841.

" *Ne varietur.* New Orleans, 30th January, 1841.
(Signed,)                  J. BERMUDEZ, *Judge.*

A due bill to the Mayor of New Orleans, for the sum of $ 100,000·00, to be employed in the construction of a building called by the name of ' N. Girod,' in the parish of Orleans, to receive

|     |     |                                              |              |
| --- | --- | -------------------------------------------- | -----------: |
|     |     | and come to the relief of the French orphans inhabiting the State of Louisiana, | $100,000 00 |
|     |     | A due bill to the treasurer of the Charity Hospital, | $30,000 00 |
|     |     | A due bill to the president of the Catholic Asylum, | 30,000 00 |
| No. 4. |  | A due bill to Mrs. Bouvard, born Poidebard, of Bordeaux, | 100,000 00 |
| 5. | Do. | Mr. Vollier Poidebard, at Chamberry, | 30,000 00 |
| 6. | Do. | Mr. Joseph Girod, | 100,000 00 |
| 7. | Do. | Mr. G. Montamat, | 50,000 00 |
| 8. | Do. | Mr. A. Michoud, | 50,000 00 |
| 9. | Do. | Mr. F. Grima, | 30,000 00 |
| 10. | Do. | Mr. Dejan, senior, | 20,000 00 |
| 11. | Do. | Mr. D. Prieur, | 40,000 00 |
| 12. | Do. | Mr. Chs. Claiborne, | 15,000 00 |
| 13. | Do. | Mr. M'ville Marigny, | 15,000 00 |
| 14. | Do. | Mrs. Widow Sabatier, | 20,000 00 |
| 15. | Do. | Mr. A. Fournier, | 20,000 00 |
| 16. | Do. | Mr. E. Rivolet, | 20,000 00 |
| 17. | Do. | Mr. E. Mazureau, | 20,000 00 |
| 18. | Do. | Mr. C. Gurlie, | 20,000 00 |
|     |     |                                              | $710,000 00 |

" I certify that the eighteen due bills, above mentioned, are, and constitute, my sole and last will.

" New Orleans, the 23d of December, 1837.
   (Signed,)                  N. GIROD."

The following is a specimen of one of these due bills : —

" Good for the sum of fifty thousand dollars, payable to Mr. A. Michoud, at the settlement of my estate.
  " $50,000.   No. 8.       (Signed,)      N. GIROD."

All these legatees were made defendants to the bill.

In the course of the suit an injunction was issued against Antoine Michoud, the executor of Nicholas Girod, to prevent him from making any payment or distribution of the funds received or to be received.

The defendants all answered; the principal answer being that of the legatees. They denied that Claude François Girod enumerated in his will and codicil all the debts due by him, but averred that he owed other and much larger debts; insisted that the authorization granted to the executors by the will, for the sale of the property, was legal; that no law of Louisiana, then existing, contained a provision by which a judge *ex officio* auctioneer was rendered incompetent, any more than any other auctioneer in the State, to sell any property whatsoever, situated within or without the limits of his jurisdiction; averred that, as no complaint was

made of the price of the property so sold by the judge, the circumstance that a portion of the property was beyond his jurisdiction was of no consequence, and the price thereof must be regarded as fair, and the sale as having been duly made ; admitted the sales of property to St. Felix and Laignel, but denied that any retrocession of the property to the executors ever took place, inasmuch as no retrocession could take place between the parties, unless the executors had been previously the sole and exclusive owners of the property ; denied that any fraud or breach of trust was committed by the executors.

The respondents, in their answer, also admitted that the executors had placed themselves as creditors, in their account of the succession, but averred that they had a right lawfully and justly to do so ; that Nicholas Girod was creditor by virtue of a final judgment of a competent tribunal, namely, the Parish Court of the Parish and City of New Orleans, rendered on the 6th of May, 1816 ; they further aver, that this judgment has, for upwards of twenty-six years past, acquired the force of *res adjudicata*, and cannot be disturbed ; that the account presented by the executors was duly homologated by the Court of Probates, and that judgment of homologation has also acquired the force of *res adjudicata*. The respondents also deny that the executors, in placing themselves as creditors of the succession in their account, and in ratifying that account under the power of attorney intrusted to them by their coheirs, abused the trust and betrayed the interest confided to them for their own advantage, and to the wrong and injury of their constituents.

The respondents further denied, that Nicholas Girod, by means of false and fraudulent representations, or concealment, had induced the complainants to sign acquittances; averred that they were signed freely, after being well informed of all the circumstances ; that Hyppolite Pargoud, the son of Madame Pargoud, had been in New Orleans, &c., &c.

The respondents inserted in their answer a number of family letters, from which they inferred that Nicholas Girod was a charitable man, and had constantly been the supporter of his distant relations, and concluded by pleading prescription.

To these answers there was a general replication.

In the progress of the suit the following admissions were filed by the respective parties : —

*Admissions of Plaintiffs.*

" PARGOUD v. MICHOUD.

" 1. Jean François Girod, senior, died, leaving a will in favor of Jean François Girod, junior, of Paris, and the share of the complainants, M'mes Pargoud and Adam, in the estate of Claude François Girod remained as it previously was, to wit, one eighth.

"2. The complainants will contest no portions of the account rendered by the testamentary executors of C. F. Girod to the Court of Probates in 1817, except the individual claims of the said two executors, and the judgments obtained on them.

"3. The heirs of Claude François Girod, with the exception of Nicolas Girod and Jean François Girod, junior, resided in Europe.

"4. All the legatees of Claude François Girod resided in Europe, except the Parish Church of Assumption, Françoise Wiltz, Françoise, the daughter of Rosette Celan, the wife of Mellion, and Pauline and Dominick, who resided in Louisiana.

"5. The lots of which Nicolas Girod has made a donation to the Poydras Asylum were worth, at the time of said donation, $35,000, or thereabouts.

"6. Nicolas Girod always resided in Louisiana, and never went to Europe after his settlement in this city under the Spanish government.

"7. All the letters mentioned in the printed answer, from pp. 27 to 38 inclusive, are admitted to be genuine, and the translations of parts thereof, in said answer, are admitted to be correct; but the complainants will require complete translations of them to be prepared, and they reserve the right of objecting to their admissibility on other grounds, if any they have.

"8. Hyppolite Pargoud was brought to Louisiana by his uncle, Jean François Girod, junior, and has resided with him in Ouachita up to the year 1821, when said uncle went to Paris.

"9. The residence of M'me Adam, of M'me Quetand, and of Jacqueline Poidebard, the wife of Joseph Rivolet, was at Thônes, in Savoy.

"10. The age of Jean François Girod, junior, now residing at Paris, is seventy-two. He is unmarried. Has no other heirs at law except the complainants, and some relatives of the same degree, or their legal representatives. He is on good terms with the complainants, and he and Hyppolite Pargoud, the attorney in fact of the complainants, are intimate friends, and Antoine Michoud is his attorney in fact.

"11. The two acquittances of M'mes Pargoud and Adam, mentioned in the answer, and since deposited in court, are admitted to be genuine, and the said complainants were, in executing them, authorized and assisted by their husbands.

"12. Hippolyte Pargoud is a man of good business habits, attentive and intelligent. He visited his family in 1827 and 1835, but at each visit stayed but a very short time with them. In 1837, he obtained a power of attorney from his mother, authorizing him to claim and recover her share in the estate of Claude François Girod. It was shown to Antoine Michoud, to be by him attested or legalized, as Sardinian consul, but it was not made use of. Hyppolite Pargoud demanded and obtained another, which was executed be-

fore a notary public on the 18th of May, 1840. From the time he received the first power, he made no secret of his intention of bringing a suit against his uncle Nicolas, and after receiving the second power, when making the inventory at Lafourche, where he was present, he said, that if there had been a will or testament made by his said uncle, he would have sued his succession in the name of his mother.

" 13. The letters which have been heretofore deposited by the defendants in the hands of the clerk of the court are genuine, and all signed by the parties in whose names they are written. But the complainants reserve all other objections to their admissibility, and if they are admitted in evidence, they must be translated.

" 14. The will of Nicolas Girod was not known when the said inventory was made at Lafourche ; it was discovered to exist some time thereafter.

" 15. By the laws of the Duchy of Savoy, Hyppolite Pargoud is a forced heir of his mother, Peronne Bernardine Pargoud, one of the complainants.

" 16. Nicolas Girod was the eldest of the family. He was      years old when he died.

" 17. In November, 1833, Nicolas Girod made a present to Philippine Poidebard, his niece (widow Nicoud), of the sum of 3,240 francs, equal to $648 ; and in March, 1834, he made her another present of 22,000 francs, equal to $4,400, both which presents she received.

(Signed,)      J. P. BENJAMIN, *for complainants.*"

And on the 29th of April, 1844, the following admissions of defendants were filed.

*Admissions of Defendants.*

" PARGOUD *v.* MICHOUD.

" 1. Denise Philippine Poidebard, the widow of Pierre Nicoud, died in August, 1841, leaving three legitimate children, viz. Benoite Colline Nicoud, Maurice Emilie Nicoud, and Jeannie Benoite Nicoud, the last of whom is a minor ; Jean Berger is her tutor. All these parties, as well as Louis Joseph Poidebard, never were in the United States.

" 2. The allegations in the answer of Jean Firman Pepin, as syndic of Jean François Girod, jr., concerning the transmission of the latter's interest in the subject-matter of this suit, are correct, viz.: that Pierre Nicolas Girod died at New Orleans, on the 1st of September, 1841, leaving a testament, by act, before Joseph Cuvillier, notary public, of the 6th of February, 1841, by which he bequeathed all his property to the said Jean François Girod, jr., his brother ; the said Jean François Girod, jr., made a cession of property in the District Court of the First Judicial District, on the 25th of January, 1842 ; that thereby the interest of both Pierre

Nicolas and Jean François Girod. jr., is vested in the creditors of the said Jean François Girod, jr., and that said Jean Firman Pepin is the syndic of the said creditors.

" 3. All the property described in the inventory of the estate of Nicolas Girod, as being situated in the second municipality, is derived from the estate of Claude François Girod. Nicolas Girod never improved this property, but leased it to John F. Miller, by two acts passed before L. T. Caire, notary public, on the 9th of May, 1829, and the 30th of April, 1831 ; each of these leases is for the space of twenty years, and for an annual rent of $ 3,000.

" 4. The age of Jean Baptiste Dejan, ainé, is sixty-seven years, and that of Claude Gurlie, seventy-two years. The former is a native of New Orleans, the latter has resided in New Orleans forty-eight years, and was intimate with Nicolas Girod as early as 1814.

" 5. Nicolas Girod never cultivated or occupied any of the lands mentioned in the bill as situated on Bayou Lafourche, except the plantation, but made levees on those lands.

" 6. The Bouvard family resided, in 1813, and has ever since been residing, at or near Bordeaux, in France.

" 7. The age of Etienne Rivolet, one of the legatees of N. Girod, is forty years. He is not related to the Girod family, except by his brother, who married Jaqueline Poidebard, one of the nieces of Claude Francois Girod, the testator, and who is therefore his sister-in-law.

(Signed,) MAZUREAU, *for defendants.*"

And on the 29th of April, the following was offered in evidence and filed.

" UNITED STATES CIRCUIT COURT.

" WIDOW PARGOUD AND OTHERS  
*v.*  } In Chancery.  
ANTOINE MICHOUD AND OTHERS.

" *Admissions and Agreements between the Parties.*

" 1. Admitted that one Joseph Gaubuan, and one     Corrino, witnesses on the part of the defendants, would, on being examined upon their oaths, declare, that it was to the perfect previous knowledge, and with the consent and authorization of Jean François Girod, jr., one of the testamentary executors of Claude François Girod, that Simon Laignel did bid and become the purchaser, at the public sale made by the register of wills, in the city of New Orleans, of the faubourg and city property belonging to said Claude François Girod, after his death ; and further, that it was also to the perfect knowledge, and with the consent and authorization, of said Jean François Girod, that afterwards the said Simon Laignel sold the same property to Nicolas Girod, the co-testamentary executor of said Jean Francois.

ss *

" 2. All objections are waived, which might have been made in consequence of the answers of the defendants, to whom interrogatories have been administered and propounded, being sworn to before Justice Jackson ; and it is agreed that the said answers, so sworn to, shall have the same force and effect as if they had been sworn to before the proper officer.

(Signed,)                                        L. JANIN.
" *New Orleans, 29th April,* 1844."

On the 29th of July, 1844, the court made a decree, of which the following is a copy.

" This cause came on to be heard this term, and was argued by counsel ; and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed as follows :— That the plaintiffs are the residuary legatees of Claude François Girod, deceased, in the following proportion, viz. Peronne Bernardine Girod, the widow of Jean Pierre Hector Pargoud, for one eighth ; Rosalie Girod, the widow of Louis Adam, for one eighth ; Françoise Peronne Quitand, the wife of J. A. Allard, for one forty-eighth ; Marie Philippine Rose Quitand, for one forty-eighth ; Marie Bernard Quitand, for one forty-eighth ; Louis Joseph Poidebard, for one forty-eighth ; Benoite Colline Nicoud, for two two-hundred-and-eighty-eighths ; Maurice Emilie Nicoud, and Jenny Benoite Nicoud, represented by Jean Berger, their tutor, each for two two-hundred-and-eighty-eighths ; Jean François Girod, the nephew, in his own right, and as testamentary heir of Pierre Nicolas Girod, his brother, and repesented by Jean Firman Pepin, the syndic of his creditors, for one twentieth ; and Françoise Clementine Girod, wife of Pierre François Pernond, for one fortieth.

" That the adjudication of landed property, with the slaves thereto attached, situated on Bayou Lafourche, made on the 18th of February, 1814, to Charles St. Felix ; the retrocession of said property by said Charles St. Felix to Nicolas and Jean François Girod, on the 23d of February, 1814 ; the adjudication of the property situated in the parish of Orleans, made to Simon Laignel on the 9th of April, 1814, and the notarial seal made to the same on the 26th of April, 1814, in pursuance of said adjudication ; and the conveyance of said property to Nicolas Girod, of the 28th of April, 1814, be set aside and annulled, saving, however, the just rights of third persons, to whom two tracts of land on Bayou Lafourche, two slaves, and a piece of ground in the city of New Orleans were conveyed by the said Nicolas Girod in his lifetime, as appears from the admissions in the pleadings.

" That the dative testamentary executors of the late Nicolas Girod do execute to the plaintiffs, or to their legal representatives, good and valid notarial conveyances and assignments of such undivided portions of the aforesaid property as correspond to the pro-

portions in which they are residuary legatees of the late Claude François Girod, as herein before declared ; which conveyances and assignments are to be settled by Duncan N. Hennen, as master in chancery of this court, in the event of a difference between the parties in relation thereto.

" And for greater certainty, it is hereby declared, that the property, of which undivided portions are to be conveyed and assigned to the plaintiffs as aforesaid, is all the property and slaves which were inventoried in the parishes of Ascension, Assumption, and Lafourche Interior, after the death of said Nicolas Girod, as belonging to his estate ; and all the property which was inventoried, after the death of said Nicolas Girod, as situated in the Municipality No. 2 of the city of New Orleans, including the property which is an alluvion, and accessory to the property derived from the estates of Claude François Girod, was abandoned to Nicolas Girod by the heirs of Bertrand Gravier, by an act of compromise executed on the 29th day of March, 1823, and also the house and lot situated at the corner of St. Louis and Chartres Streets, in Municipality No. 1 of the city of New Orleans.

" That the account filed by Nicolas Girod and Jean François Girod, in the Court of Probates of the Parish of Orleans, in May, 1817, be opened and set aside; that the sum of $ 40,418·09, claimed by Nicolas Girod in said account, and the sum of $ 8,253·20, claimed by Jean François Girod for himself in said account, be disallowed and rejected ; that the two judgments which were obtained in the Parish Court of the Parish of Orleans, in the year 1815, for the aforesaid two sums of $ 40,418·09, and $ 8,253·20, be declared satisfied, and that no allowance be made to the defendants on account of said judgments.

" That the two acquittances and releases given, in 1817, by the plaintiffs, Madame Adam and Madame Pargoud, to Jean François Girod, be set aside, and be allowed no other force or effect than as acknowledgments of the receipt by Madame Pargoud for 5,242·75 francs, and by Madame Adam for the sum of 10,242 francs 75 c., making respectively the sum of $975·15 and $ 1,905·15 in the currency of the United States, as stated in said receipt.

" And it is ordered, that a reference be made to the said master in chancery, to take an account of what is due from the estate of Nicolas Girod to the plaintiffs on account of the property belonging to the estate of Claude François Girod and alienated by said Nicolas Girod, for rents and profits, and for interest ; and of what may be due by the complainants to the estate of Nicolas Girod, for payments made by the said Nicolas on account of the debts of the said Claude François Girod, and of the legacies made by him, and of permanent improvements ; and in taking said account, said master shall charge the said estate with the value of the crop

alleged to have been on hand when the property in Lafourche was adjudicated to Charles St. Felix, with interest thereon ; with the amounts which, by the aforesaid account of 1817, the said executors acknowledged to have received, or for which they consented to become responsible, from the time the same were received; with the price at which the two tracts of land on Bayou Lafourche and the two slaves were sold, and which are mentioned in the pleadings as having heretofore been sold, with interest thereon, from the time when, according to the bill of sale, said price was payable ; with the sum of thirty-five thousand dollars, this being the admitted value of the price of the ground donated by Nicolas Girod to the Female Orphan Asylum, with interest thereon from the time said donation was made ; with the rents and profits of the plantation and slaves, the house at the corner of Chartres and St. Louis Streets, and the property in Faubourg St. Mary, now called the Second Municipality, from the adjudication of 1814, and at the rate which might reasonably, and with a proper administration, have been obtained for the same, it being understood that from the years 1829 and 1830, when the property in Faubourg St. Mary, or Second Municipality, still undisposed of, was leased to John F. Miller, the rents and profits thereon are to be charged at the rate at which the rent was stipulated in the lease to said Miller.

" And the said master shall credit the estate of Nicolas Girod in said account with the amount with which said executors credited themselves in their account of 1817, with interest thereon, except their aforesaid two personal claims of $ 40,418·09, and $ 8,253·20; with any payments that have been made on account of legacies left by the said Claude François Girod, with interest thereon ; and also with one half of the rents and profits of the plantation and slaves of Bayou Lafourche, up to the time when Jean François Girod sold his interest in the same to Nicolas Girod, the plaintiffs having in their bill consented to abandon the half of these rents and profits supposed to have been received by the said Jean François Girod ; and also with the actual cost in money to Nicolas Girod, but without interest, of the permanent improvements made by said Nicolas Girod, and still in existence, on the lot at the corner of St. Louis and Chartres Streets, and on the lands on Bayou Lafourche, deducting therefrom the value of the labor of the slaves of the said plantation, and of the materials procured from the same, and making, also, proper deductions for the diminution in value of said improvements by wear and tear ; and all the interest to be charged in said account shall be so charged at the rate of five per cent.

" And the said master shall compute what amount of the balance so to be found against the estate of Nicolas Girod shall be paid to each of the plaintiffs, according to their declared proportionate interest in the estate of Claude François Girod, and said balance shall be paid to them, with interest, from the date up to which the

master's report may present a calculation of interest, unless, on application of the parties, the court shall otherwise direct ; and said payment shall be made by the dative testamentary executors of Nicolas Girod, out of the funds of said estate, in preference to any legacies. And for the better discovery of matters aforesaid, the parties are to produce before the said master, upon oath, all books, papers, and writings, in their custody or power, relating thereto, as the said master shall direct. And the said master shall, when necessary, examine said parties upon written interrogatories.

" And it is further ordered, that the said dative testamentary executors pay out of the funds of said estate the costs of this suit. which have hitherto accrued. And it is further ordered, that either party, if so advised, be at liberty to apply to the court for a partition in kind, or by sale of the above-mentioned real estate of Nicolas Girod. And all further directions are reserved until the master shall bring in his report.

" Decree signed, July 30th, 1844.

(Signed,)  THEO. H. McCALEB,  [SEAL.]

*United States Judge.*"

From this decree, the defendants appealed to this court.

The cause was argued by *Mr. Eustis*, for the appellants, and *Mr. Janin*, for the appellees.

The following is a synopsis of the argument of *Mr. Eustis*, for the appellants.

The facts necessary to an understanding of this case are few and not complicated ; most of them are admitted in the answer, and others are established by documentary evidence.

The action is founded on an alleg d purchase of the effects of the succession of Claude Girod by his executors.

Claude Girod died in 1813, leaving a will made in 1812.

The sales complained of took place in 1814.

The commencement of the adverse possession, and the uninterrupted, exclusive, and notorious enjoyment of the revenues of the estates being fixed by the complainants' own bill, we proceed at once to the matters of defence which those facts present, and which are set forth formally in the answer.

1. The first ground of defence is the entire want of equity in the complainants' case, arising from the silence, acquiescence, and laches of the complainants since 1814.

The principles on which courts of equity refuse their assistance to parties under circumstances like the present are familiar to the court. The most recent cases are the following : — McKnight v. Taylor, 1 Howard, 168 ; Bowman v. Walthen, 1 Howard, 193 ; Smith v. Clay, 3 Brown's Ch. R. 640, n. ; Stearns v. Page, 1 Story, 215 ; Giles v. Baremore, 5 Johns. Ch. R. 550 ; Piatt v. Vat-

tier, 9 Peters's R. 417 ; Story's Equity, §§ 1519, 1520, *et seq.* ; Fonblanque's Equity (last edition), notes to Book 1, c. 4, § 27.

2. The allegations and evidence adduced by the complainants are no. reasonably definite as to the time, occasion, and circumstances of the alleged concealment, misrepresentation, and frauds; nor is any account given of the time of the discovery. Of the fact of the adverse possession, it is not even alleged in terms that the plaintiffs were ignorant ; the allegation of ignorance of the real situation, &c., is not sufficient for a court of equity to base its action upon. Stearns *v.* Page, 1 Story's R. 215.

The allegations of ignorance, concealment, &c., are expressly denied and put at issue by defendants.

By the testimony of J. F. Girod, J. M. Girod, Michoud, and Rivolet, receipts, &c., the fact of knowledge is put beyond a reasonable doubt.

3. The allegations of the complainants in their amended bill afford strong evidence that the relief sought by them will not be a matter of equity, but a speculation upon events.

The will of the testator, Nicholas Girod, and the large amount of legacies, was the cause of the suit, not the injustice and wrongs of 1814.

The release of the co-executor, J. F. Girod, and their conduct towards him, point to the same conclusion. He is rich and alive. The chances of inheritance offer a greater benefit than the result of litigation. They acquiesce, discharge him, and await his bounty. N. Girod is dead, and all their vials of wrath are opened upon his grave.

4. The defendants rely upon prescription as a defence.

There is a marked difference between prescriptions and statutes of limitation. The former create rights ; the latter merely reach remedies, and in a very qualified and artificial manner.

Prescription is a manner of acquiring property and of discharging debts by the effect of time. It is a title as much so as that of inheritance or sale is. All are on the same footing, and a court can no more interfere with rights under the one than under the others. Louisiana Code, 3421 ; Code of 1809, p. 482, art. 32.

By the civil law, prescription is a mode of extinguishing obligations, and is classed with payment, novation, &c. The obligation itself is extinguished *in foro conscientiæ*, as well as *in foro legis.* Louisiana Code, art. 2126 ; Code of 1809, p. 286, art. 134 ; Troplong on Prescription. c. 1, §§ 2, 31 ; Code Napoleon, 1234, 2219 ; Institutes of the Civil Law of Spain, p. 103, lib. 2, tit. 2, p. 108.

Under the civil law, from motives of public policy, great weight in matters of property is given to possession. The oldest legal maxims of which we have record establish the principles, which modern nations, so far from deviating from, have rather restricted.

The policy has stood the test of experience and of time.   Possession is at once the object, the attribute, and the proof of property ; hence it forms the basis of a title, that of prescription.

Nicholas Girod purchased and possessed the estates mentioned in the bill since 1814.

He acquired to them a complete title, by prescription, under the laws of Louisiana.   His acts of conveyance were public and authentic, and duly recorded in the proper offices.   There are several articles of the Code providing prescriptions, which cover this case.   Article 2218, and 204, p. 302, of the Code of 1809, provide, that in all cases in which the action of nullity or of rescission of an agreement is not limited to a shorter period by a particular law, that action may be brought within ten years.   In cases of error or deception, the time of the prescription dates from the day on which either was discovered.   In this case, there was no secrecy or concealment, and there could be no discovery, in relation to the fact of the sales to N. Girod.   The property was not kept concealed under the name of a third person, but in his own, and placed on the public records as belonging to him.   The adverse possession alone was full notice to the complainants.   It was sufficient to put them on the inquiry, and they had all the means of information to lead them to a knowledge of the facts, and in law are deemed consonant of them.   Sugden on Vendors, 542 ; 1 Atkyns, 489 ; 1 Johns. Ch. R. 267 ; 2 Binney, 466 ; 15 Johns. R. 555; Willison v. Watkins, 3 Peters, 52; 10 Peters, 222, 223; 1 Howard, 196 ; see also the opinion of Pothier on prescription, as affecting absentees, Treatise on Obligations, No. 649 ; Institutes of the Civil Law of Spain, lib. 2, tit. 2, p. 108.

The only fraud in relation to the sales which can be pretended is, that the executors purchased at the public sales.   This fact, if it was so, is as apparent when the titles were put in their names as it is now.

But, if the only fraud in the sales arises from the incapacity of the party to purchase, the prescription of the article 3507 applies with great force.   That provides that the action of nullity, or rescission of contracts, testaments, or other acts for the rescissions of partitions, &c., is prescribed by five years against persons living in the State, and ten years against absentees.

Is not the agreement between J. F. Girod and Me. Pargoud, of November 10, 1817, a contract, — an act ?   Is it not, under the decisions of our courts, a partition ?   It is stated in the instrument, that it is for her share in the succession reduced into movable effects, mobilise, turned into money.   " Whatever may be the form of the act, it is well settled that every first settlement between heirs or partners, by which a state of indivision is terminated, is in substance a partition," say the Supreme Court.   And an action to set aside, on the ground of lesion and fraud, an agreement by which

six slaves were given in consideration of a relinquishment on the part of an heir of all her right and interest in the succession of her mother, in favor of her father-in-law, was held to be barred by the prescription of five years under this article 3507. See 3 Robinson's R. 317 ; 14 Louisiana R. 22 ; 15 ibid. 517; 16 ibid. 252.; Tippet and husband v. Jett. Here the court hold that even fraud is prescribed against under this article, without any reference as to the time of the discovery of it.

The prescription of actions for lesion, in contracts generally, is only four years. Code, 1870. There is another prescription which protects the defendants, — that of twenty years under a just title ; that is, a title by which property can be transferred. Louisiana Code, 3442 ; Code of 1809, p. 488, arts. 60 – 72.

After the 10th of November, 1817, the date of the receipt of the funds of the succession, in which it is stated that the property is *mobilise*, — converted into money, — there was nothing to impugn the justice of the title to the property sold, which could not be affected by any misappropriation of the purchase money. This would constitute a claim, and give rise to a personal action, which would not affect the title to the property, which must rest on the state of things in 1814. The heirs in Europe must be considered as being satisfied with the price the property sold for, and constituted themselves creditors for their respective shares. The complaint that they have been wronged out of the proceeds presupposes that the sales were made ; and though it may or not be true that they have been hardly dealt with, as the complainants allege, it by no means follows that the property was, in 1814, sold or purchased in bad faith. In matters of prescription by possession, good faith is presumed ; bad faith, in a possession, must be proved. Art. 3447. On the form of the title, see Toullier, 8 vol., No. 508, 509, art. 3,453, *et seq.* ; Merlin, Questions de Droit, verbo *Mineur*.

There is a statute on this subject which clearly points out the policy of the law, which is decidedly against stale claims, and reduces the prescription in previous sales to administrators, executors, &c. to two years from its passage, and recognizes their right to purchase in all cases in which they have an interest in the property sold, as heirs, legatees, or partners. This law is very important in the consideration of this case. Laws of Louisiana of 1840, p. 123, No. 112, passed on the 28th of March, 1840.

5. The answer contains an argument on the facts. The letters offered by defendants are found at pp. 200 – 215 ; the answers under oath from pp. 91 – 101. The most important deposition, that of the co-executor, J. F. Girod, taken in Paris, at p. 139. It was offered in evidence by the complainants.

The complainants call upon the defendants to explain all the affairs of this succession, which was opened in 1813. The de-

Michoud et al. *v.* Girod et al.

fendants are all strangers to them. They are the dative executors, appointed by the Court of Probates, and not by the will of the testator and legatees. Vide the will.

Why did they not call upon him who alone could give them information, — upon N. Girod, in his lifetime ?

But they called upon J. F. Girod, the co-executor of Claude Girod, and the alleged confederate in these marvellous frauds. Let his deposition speak. Does he say the sales were fraudulent, or that his coheirs were wronged ? It is decisive of the case. One sentence alone closes it : —

"Then (1817) it was that N. Girod, who had settled the estate, handed me a copy of the account rendered to the Court of Probates, and a copy of C. F. Girod's testament, and it was on the faith of these documents, presented to the heirs in Europe, that I paid to each of them and to the legatees what accrued to them."

J. F. Girod was sent to Europe by his brother to pay the heirs who resided in Savoy. The act in the bill of complaint, signed by Me. Pargoud, was made at Annecy, in Savoy. He met his brother, the priest, in Paris. He refused to examine the accounts in Paris. Vide his letter. The account on which the heirs were paid by J. F. Girod is found at length at pp. 125 – 128 ; the will of Claude Girod, pp. 163, 164. In the account are stated the amounts due N. Girod and J. F. Girod, namely, of $ 40,413·09, and of $ 8,253·20. These items are charged as paid, and the succession is credited with the proceeds of the property sold. The account is a settlement of the affairs of the succession, on which the payment was made in Savoy, in 1817.

A strict examination of the evidence must result in the conviction of an entire want of evidence to establish any thing like fraud on the part of N. Girod.

There are some matters of law which it may be well to consider under this head.

*a.* By the will the executors were empowered to sell, without the intervention of justice, as to them should seem best for the interest of the absent.

*b.* The executors were bound to cause the property to be sold. Code of 1809, p. 246, arts. 173, 174 ; p. 174, art. 128.

*c.* The heirs present had a right to insist on a sale for cash. Ibid., p. 174, art. 129.

*d.* The law requires the estate to be settled within the year, where it can be done. The possession of the executor does not continue after a year and a day. Ibid., p. 244, arts. 166, 169, 173, et al. ; 4 Martin's R. 340, 609 ; Norwood's case, 10 ibid. 723.

*e.* After a considerable lapse of time, the presumption *omnia rite acta esse* applies ; besides, by the law of 1834 (p. 123 of pamphlet acts), all informalities growing out of a public sale by a

parish judge, or other public officer, are prescribed by the lapse of five years. 2 Robinson, 377 ; 16 Louisiana Rep. 554.

*f.* But the executors did not sell ; the judge sold at public auction, and in the most public, fair, and formal manner.

Code of 1809, pp. 174, 127 – 129. The judge sells, not the executor or curator. The sale was complete without any act of the executors. 3 Martin, 592.

*g.* No decree of the court was necessary to authorize the sale. If there was, one must be presumed after this lapse of time ; for the judge himself sold. But none was necessary. Commentary of Gregorio Lopez on Law, 62, tit. 18, part. 3, which treats of sales made by executors, and only requires them to be made at auction.

6. The decisions of the Supreme Court went far beyond the law in establishing incapacities to purchase at judicial sales under the old laws ; the legislative interpretation of 1840, before cited, puts this fact beyond question. In interpreting the Spanish laws, the decisions of the Supreme Court of Louisiana are very unsafe guides, as every one knows who has scrutinized them.

It is a great mistake to suppose that purchases made by an executor, at a public sale made by a judge of the property of a succession, are absolutely null and void. The inhibition is, at best, a matter of precaution, to prevent abuse, and is established in the interest of the heirs, and for their benefit exclusively. The authorities cited by the complainants prove this beyond question. 13 Louisiana R. 396. This they may renounce or enforce, after a reasonable time, according to their own peculiar views. Louisiana Code, art. 11 ; 7 Toullier, 562, *et seq.*, 665, *et seq.* ; Sugden on Vendors (ed. of 1834), 436. In all cases where a purchase is made by a trustee, it is optional with the *cestui que trust* to set it aside. Story's Equity, §§ 322, 308. The *cestui que trust* has a right to set aside the purchase, and have the estate resold, if he choose, within any reasonable time, to dissent from the purchase. 5 Vesey, 678 ; 13 Vesey, 600.

The purchase by a curator or trustee is *malum prohibitum,* and not *malum in se.* 8 Toullier, § 517, p. 713 ; 2 Sugden on Vendors (edition of 1836), 143 ; notes to page 125, No. 329. In Randall *v.* Ermington (10 Vesey, 428), the fact of the purchase was not clear, the possession of Ermington was equivocal ; but, in all cases where there is a continued public adverse possession, the party dissenting must apply within a reasonable time for relief ; he must not lie by and speculate on events. 5 Vesey, 678 and 680 ; Newland on Contracts.

The court cannot permit the parties in this case to speculate on the chances of war. The appraisement, the basis of the mortuary proceedings, is not impugned, nor is the adequacy of the price. The complainants were satisfied with it, even in 1817. They have

waited until the growth of the country has given an increased value to real property, and now ask the court, not to do justice, but to accomplish for them a speculation. Had Louisiana been reduced to colonial vassalage, and enjoyed the advantages of negrophilism, or had the father of the floods, instead of adding to the extent of the suburban estates, reduced, by its frequent abrasions, their extent and value, and burdened it with riparian works and charges, we should have been held accountable for the price, — at their option the thing or the price, as it is most advantageous to the claimants. What is this but a speculation on events, which law and good faith repudiate ?

7. There has been a ratification of the sales by receiving the price, or part of it. This is what is called the voluntary execution of the contract of sales. The article 2252 of our Code, and 238 of the Code of 1809, p. 310, say it is sufficient that the obligation be voluntarily executed, to throw the proof of ignorance of the party ratifying on him who alleged it. Where there is an execution of the contract by receiving the price, the party executing it is presumed to know any defects or grounds on which it could be annulled, and ignorance of them must be proved, which can be very easily done where there has been any misrepresentation or deceit. And if part of the price be received, the remedy of the party is by a personal action against the executor or trustee for any abuse of his functions.

8 Toullier, 508 – 510, 513, cit. Merlin, Questions de Droit, verbo *Mineur.*

The case of Rivas, relied on by complainants, contains no new doctrine. The question there was, whether the party had received part of the price of the plantation in dispute knowingly, that is, knowing that the money he received came from the sale. The court, not being satisfied of the fact, of course held that there was no ratification, but asserted the principle maintained in 8 Toullier, 519, art. 2252 of the Louisiana Code.

The law never permits a person to mislead another by his silence, where, by the relations between them, he is bound to speak. This property had been sold, the executors were the agents of complainants, the accounts were before them, the price which the property brought was laid before them, and if they thought proper to receive their portions, they certainly ratified the sales. Their claim for a further portion of the price remains to be considered. Story on Agency, § 255, and cases cited.

The application of these principles to the payment and discharge in Europe, as explained in the testimony of J. F. Girod, requires no observation.

8. An examination of the articles of the Code of 1809 cited by complainants will satisfy the court that the parish judges of the place where the property was situated were competent to make the

inventories, appraisements, and sales. Page 246, art. 174 ; page 174, art. 127 – 129.

The French text of art. 127, cited, puts the matter beyond controversy, — *le juge de 'la paroisse ou des paroisses*, in which the deceased had property, hall make the inventory ; and art. 128 provides, that the judge making the inventory shall make the sales. The art. 137, p. 178, refers to curators appointed by a judge. The executor is appointed by the will, and not by the judge.

It is not alleged in the bill or supplementary bills, that the parish judges who made the inventories and sales acted without authority, except as to the sale of the land in the parish of Lafourche Interior by the judge of Assumption. Nor is it alleged that the Court of Probates of New Orleans was without jurisdiction as to the settlement of the executor's accounts and liquidation of the succession.

The only allegation as to the defect of jurisdiction of any of the courts is found in the amended bill, p. 102, in which it is charged that the Parish Court of New Orleans, which rendered the two judgments alleged to be fraudulent, is incompetent. How incompetent ? By reason of what ? Query, for want of jurisdiction, or for want of proper parties ?

Questions of jurisdiction, under the old judicial system of Louisiana, particularly of the courts of probates, have been difficult; and, after this lapse of time, every presumption must be in favor of what has been done in courts of justice. 2 Robinson's R. 377 ; Drenet's case, 8 N. S. 705.

As to the undoubted jurisdiction of the court of the parish and city of New Orleans, which rendered the judgments attacked as fraudulent, vide Tabor's case, 3 Martin, N. S., 676 ; 6 Martin, N. S., 676; 8 ibid. 241 and 705; 7 ibid. 378. The Code of Practice, enacted in 1825, vested the jurisdiction in the courts of probate exclusively of all claims for money against successions.

The jurisdiction of the Court of Probates of New Orleans, which homologated the executor's account, not having been questioned in the bill, this court will not disturb its decrees. The jurisdiction existed *ratione materiæ*, the creditors assented thereto ; the succession was solvent, and the vesting of the jurisdiction in any other court by the articles quoted is merely a matter of implication, and by no means exclusive. Vide Tabor's case, cit. 3 Martin, N. S., 680.

9. Respecting the effect given to judgments homologating proceedings, tableaus, accounts, &c., vid. 6, N. S., 133, 654 ; 11 Louisiana R. 571 ; 7 N. S. 183, 433 ; 4 Louisiana R. 174. The settlement established by the judge in a judgment against a curator or executor. Code of 1809, p. 180, art. 145.

As to the appointment of a defensor to represent absent heirs in suits and vacant successions, vide 4 Martin, 666 ; 10 Martin,

17 ; 4 Louisiana R. 259 ; 6 Martin, N. S., 17 ; Seymour's case, 9 Louisiana R. 79.

10. Homologations, like other judgments, must be annulled by a judgment of the court which rendered them. 12 Louisiana R. 406.

Every judgment in Louisiana is subject to an action of nullity, but it must be brought before the court by which the judgment was rendered. 1 Louisiana R. 21. Code of Practice, article 608, and notes.

If the court would not give the party relief, then, and only then, can relief be sought before the courts of the United States. The doctrine established by this court in the Gaines case, concerning relief against the effect of a will, is similar in all respects to that which is here invoked.

11. It appears that in the account filed by the executors in the Court of Probates of New Orleans, and exhibited, with the will, to the heirs in Europe by J. F. Girod, on which he made the payments to the heirs, were two sums with which the executors charged the succession of Claude Girod ; one was for $ 40,413·09, as paid to Nicolas Girod ; and the other was for $ 8,258·20, paid to J. F. Girod The sums are stated to be by account annexed, approved by the judge. Vide Code of 1809, p. 180, article 145.

The complainants, acting uniformly on the principle of one course of conduct for the living and another for the dead, have discharged J. F. Girod, and seek to make N. Girod's succession responsible for both debts.

It appears that the judge of the Court of Probates did not approve these accounts against the succession of Claude Girod until they had been litigated on, and settled judicially, in a court of law. Judgments were rendered on each claim in the court of the parish and city of New Orleans ; on that of N. Girod on the 5th December, 1814, and on that of J. F. Girod on the 6th May, 1815. On these judgments the vials of wrath are poured forth by the complainants. Rec. 163 – 182.

Recourse is had to conjecture, when nothing would have been easier than to prove any fact in relation to these judgments by J. F. Girod himself, who, so far from being interrogated concerning these debts, is provided with a complete and full discharge.

The consequences and effect of this discharge of the plaintiff in one of the suits, and the recipient of the money and the defendant in the other, will certainly have an important bearing on the equity of the complainants' case ; and the absence of this proof, which is at hand, will show that they rely more on confusion and conjecture for success than on evidence.

The court of the parish and city of New Orleans had jurisdiction of the cases, as has been shown.

An objection has been made, that there were not proper parties. What prevented an executor, who had a disputed claim on a suc

cession, establishing in an ordinary tribunal, as the laws stood before the Code of Practice? The art. 137 (p. 248, Code of 1809) gives the power of one executor to represent the succession, where there are more than one executor who has accepted. Code, 1674; vide 3 Martin's R. 247. The appearance and answer of the defensor of absent heirs strengthens the validity and fairness of the proceedings.

The judgments, being valid in point of form, must stand until they are annulled and declared void by a proper tribunal. 7 Martin, N. S., 257; 11 Martin's R. 607; 5 Martin, N. S., 664.

These judgments are attacked as fraudulent. Unfortunately for the complainants, there is no circumstance by them even conjectured which may not have been removed by evidence.

The testimony and evidence on which these judgments were rendered is not before us; but let us take up that in favor of N. Girod, which is the only one we have any interest in maintaining, since the release of J. F. Girod.

Claude Girod was a trader, and left at his death various accounts, books, papers, &c., which were inventoried at his death.

He had transactions with his elder brother Nicholas, who was a merchant in New Orleans. The witnesses examined by the arbitrators were Boussignes, Pacaud, Guillot, and J. F. Girod.

The arbitrators, as will be seen by the reasons appended to each item, founded their opinion on the testimony of witnesses, and the examination of books, documents, and vouchers.

It is complained that the case was referred to arbitrators; — was it not a case of old and complicated accounts? 7 Peters, 625; 1 Martin's Digest, verbo *Accounts*, 405.

Arbitrators, by our code, are to decide according to the strictness of the law. Louisiana Code, 3077, Code of 1809, p. 442, art. 12; Law of 1805, verbo *Accounts*; 1 Martin's Dig. 405.

The interest may well have been due. Suppose that C. Girod, in his books, charged interest on his accounts with his brothers; was he not bound to allow it?

The prescription may have been proved to have been interrupted by acknowledgment and promises. The interruption is proved positively by the testimony of Guillot. It was only in the case of Goddard and Urquhart, in 1834, that the prescriptions under the Spanish law were established. In Lobdell's case (7 Martin, N. S., 109), the Supreme Court held, that the prescription of a promissory note, under the Spanish law, was thirty years. It is a mistake that Claude Girod says in his will that he leaves no debts but to the amount of $ 30,000. He says, I am indebted to divers persons by obligations, and little by accounts, in a sum of about $ 30,000. He may have meant to persons other than his brothers, — to persons out of his family. Debts, especially old ones, between broth-

ers, are lightly thought of by debtors ; but creditors have better memories.

The declarations, indefinite as these, in a man's will, are bad arguments against the existence of a debt, and no proof at all.

Nor did N. Girod, in his petition for the sale of the property of Claude Girod's succession in New Orleans, limit the legacies and debts to $60,000. He says, the amount of legacies and debts which it is necessary to pay without delay is that sum, or thereabouts.

Several of the persons who are parties to these suits are still living ; the respectable counsel for the plaintiff is still at the bar, and the gentlemen appointed arbitrators were persons whose characters were of the highest consideration.

But this court will enter into no such inquiry in a matter in which the presumption is *omnia acta rite esse.*

Supposing there were no judgments, were not the amounts exhibited to complainants, when the payments were made to them, and the will, with its contents, shown to them, and does not the claim for these amounts resolve itself into a personal action to recover money unlawfully retained, as they allege ? and is not an action of this kind prescribed by ten years, according to complainants' own showing ? Goddard's case, 6 Louisiana R. 660.

It is believed that the grounds of defence to this action are so obvious, as to require little else from the court than an examination and scrutiny of the facts. To aid in this examination, this summary has been prepared, and is respectfully submitted.

### *Assignment of Error.*

The appellants assign for error in the decree rendered against them in the court below, —

1. That there is a total want of equity throughout the complainants' bill, and in the evidence adduced in support of it.

2. That, under the evidence and allegations of the bill, the complainants have no claim in a court of equity, by reason of their long silence, laches, and acquiescence in the acts complained of since 1814.

3. That the cause of action, as set forth by the complainants, is barred and prescribed by lapse of time under the laws of Louisiana.

4. That the disallowance of the sums of $40,418 and of $8,253, and the decree concerning the judgments for said amounts, is contradictory and in violation of law.

5. That the agreements made by two of the complainants with the defendant in 1817 are valid, obligatory, and conclusive upon the parties ; that the declaration of the co-executor, J. F. Girod, has the same effect.

6. That the discharge of J. F. Girod, the co-executor, destroys all claim in equity against the defendants.

*Mr. Janin,* for the appellees, relied upon the following points and authorities.

1. Although the will authorized the executors " to sell the property, or cause it to be sold, as to them would seem best for the heirs of the testator, without the intervention of justice," the Spanish law, then in force in Louisiana, yet required that the property should be sold at public sale, by order of court, and after thirty days' advertisement. Gayoso *v.* Garcia, 1 Martin's R., N. S., 324.

2. A succession sale, made by the register of wills in the parish of Orleans (or by the parish judges in the country parishes, who there perform the functions of the register of wills, Code of 1808, p. 182, art. 153), is null and void, if not preceded by an order of the Court of Probates. Elliott *v.* Labarre, 2 Louisiana R. 326.

3. Probate sales, sheriff's sales, or judicial sales of any kind, can be set aside by the parties in interest, and treated as nullities, if the formalities prescribed by law are not complied with. Psyche *v.* Paradol, 6 Louisiana R. 366 ; McDonough *v.* Gravier's Curator, 9 Louisiana R., and cases there cited.

4. The act of the legislature of Louisiana, of March 10, 1834, by which certain irregularities in judicial sales are cured by the lapse of five years, applies only to irregularities in the advertisements. Morton *v.* Reynolds, 4 Louisiana R. 28 ; McCluskey *v.* Webb, ibid. 206. And even so far as the statute is applicable to the facts of this case, it cannot avail the defendants, because it was not pleaded.

5. By the civil law, as well as by the law of chancery, an executor cannot purchase the property of the estate which he administers. Harrod *v.* Norris's Heirs, 11 Martin's R. 298 ; Longbottom's Ex'r *v.* Babcock et al., 9 Louisiana R. 48 ; Scott's Ex'rs *v.* Gorton, 14 ibid. 114, 122 ; McCluskey *v.* Webb, 4 Rob. R. 201 ; 1 Story's Eq. Jurisp. 315 ; Prevost *v.* Gratz, 1 Pet. C. C. Rep. 368 ; Wormley *v.* Wormley, 8 Wheat. 421 ; Case *v.* Abeel, 1 Paige, 397 ; Davoue *v.* Fanning, 2 Johns. Ch. R. 252 ; Rogers *v.* Rogers, 1 Hopk. 525.

6. The judgments obtained by Nicholas Girod for $40,418·09, and by J. F. Girod for $8,253·20, were the result of the fraudulent contrivances disclosed by the evidence. It is well settled, that chancery will relieve collaterally against frauds in judgments. 1 Story's Eq. Jurisp. § 252 ; 2 ibid. § 1252 ; 1 Maddock's Ch. Pr. 300 ; Mitford's Eq. Plead. 266 ; Brashear *v.* West, 7 Peters, 616 ; Pratt *v.* Notham, 5 Mason, 103 ; Garnett *v.* Mason, 2 Brockenbr. 213 ; Marine Ins. Co. *v.* Hodgson, 2 Cond. R. 526 ; Bateman *v.* Willoe, 1 Sch. & Lef. 205 ; Winthrop et al. *v.* Lane, 3 Dess. 323 ; Irby *v.* M'Crae, 4 Dess. 429 ; Barnsly *v.* Powell, 1 Ves. sen. 289.

7. Even without fraud, these judgments could not be binding upon

the heirs, for they were not parties to them, and the executors did not represent them or the estate in these proceedings. These were indeed judgments without parties. Co-executors are bound jointly and severally. Code of 1808, p. 248, art. 177 ; 2 Story's Eq. Jurisp. §§ 1280, 1281. One of them may act for all. (Same article of the Code of 1808.) They are considered in law as one person. 2 Williams's Executors, 620. Hence, if one confess the action, judgment shall be given against them all. Ibid. 621. And they cannot sue one another, if they have accepted the trust. Ibid. 685, 818.

8. Though the attorney of the absent heirs was made a party to these suits, the judgments are not binding on the heirs. The duties of such an attorney are merely conservatory, — he never represents the estate. In cases of mere neglect, and free from fraud, judgments obtained contradictorily with the attorney of the absent heir have been treated as nullities. Stein *v.* Bowman, 9 Louisiana R. 282 ; Collins *v.* Pease's Heirs, 17 ibid. 117. As a general rule, the courts disregard entirely judgments opposed to parties who were not cited or not properly represented. Psyche *v.* Paradol, 6 Louisiana R. 366 ; Marchaud *v.* Gracie, 2 ibid. 148.

9. The homologation of the account of 1817 is not *res judicata.* It appears, from the petition of the executors, and from the order thereon, that the heirs were not at all represented in this proceeding ; the executors themselves preferring to represent them. An attorney was indeed appointed to represent the three heirs of the Poidebard family, who had not sent their powers of attorney to the executors, and who were, together, entitled to one sixteenth of the estate. But they, also, will be relieved from the effects of the homologation on account of the fraud of the executors, and the neglect, if not worse, of the attorney of the absent heirs.

10. The proof of fairness, in dealings between trustee and *cestui que trust,* lies upon the former. 8 Cond. Ch. R. 495 ; 1 Story's Eq. Jurisp. § 218.

11. By the civil law, a purchase, by an executor of the property, of the estate administered by himself is radically null, and cannot be cured by prescription. His possession as executor is called, in that system of jurisprudence, a " precarious " possession ; by no act of his own can he alter its character ; he cannot sell to himself ; notwithstanding an attempted purchase, the law considers his possession as the precarious possession of an executor, and a precarious possession cannot prescribe by any lapse of time. Macarty *v.* Bond's Administrator, 9 Louisiana R. 355 ; McCluskey *v.* Webb, 4 Rob. R. 201 ; Montamat *v.* Debon, 4 Martin's R., N. S., 152 ; Troplong on Prescription, Nos. 509, 517 ; 1 Vazeille on Prescription, Nos. 148, 149 ; Pothier's Treatise on Possession, Nos. 64 – 66.

12. If any prescription was applicable to the purchases of the executors, it would be the prescription of thirty years, which protects purchasers in bad faith. Code of 1808, p. 486, art. 66; Code of 1825, art. 3438, 3465; François *v.* Delaronde, 8 Martin's R. 629; Troplong on Prescription, Nos. 905 – 907, 915, 918; 21 Duranton, Nos. 352 – 354.

13. The prescription of ten and twenty years relied on by the defendants, that is, of ten years between present, and of twenty years between absent persons, can be pleaded only by those whose possession was acquired, — first, honestly; second, by virtue of a just title; third, by a title not defective in form. Code of 1808, p. 486, art. 67; Devall *v.* Choppin, 15 Louisiana Rep. 566; Code of 1825, art. 3442, 3445, 3449 – 3454.

But this prescription was not pleaded by the defendants.

14. The only prescription which the defendants plead in their answer is the prescription of the action of nullity (p. 81 of the answer). This is a prescription of ten years, established by art. 204, p. 303, of the Code of 1808, which is literally the same as article 2218 of the Code of 1825, and article 1304 of the Napoleon Code.

The answer rests this prescription on the receipts given in 1817 by Mme. Pargoud and Mme. Adam, representing two of the five branches of heirs on whose behalf this suit has been brought.

The terms of the law show that this prescription applies only to actions of nullity or rescission to set aside an " agreement." This is not an action of nullity, but an action of revendication, or petitory action, which, as has been seen, is barred only as between absent persons by the prescription of twenty or of thirty years, according as the purchaser was in good or in bad faith.

The receipts were not " agreements," but an acknowledgment of the reception of a sum of money, which the executors represented as all that was coming to those two heirs from the succession.

Even if these receipts were " agreements," in the sense of the article, the right to set them aside would be barred only by the term of ten years " from the discovery of the fraud." The evidence shows that the complainants had not the slightest knowledge of the fraudulent acts now proved, before 1837.

15. The defendants also contend, that these two receipts imply a ratification of the acts of the executors. The definition and attributes of acts of confirmation and ratification are given in article 238, p. 310, of the Code of 1808, which is a literal copy of article 1338 of the Napoleon Code, and which was retained in the Code of 1825 as article 2252.

But no ratification or confirmation exists in this case, because, —

1st. The original sales, being absolute nullities, are not suscepti-

ble of ratification. If it was the intention of the injured party to sanction them, nothing less than a new sale would have been required to accomplish this object. Acts infected with a radical nullity cannot be ratified ; they must be made anew. Solon, Théorie sur la Nullité, vol. 2, pp. 262, 292, 294, 296, 301, 321, 327, 328, 373 *et seq.*, 406 ; Troplong on Prescription, n. 905 – 907.

2d. If considered as an express ratification of its fraudulent sales and judgments, the receipts are inoperative, for they do not contain, in the words of the law (Code of 1808, p. 310, art. 238), " the mention of the motive of the action of rescission, and the intention of supplying the defect on which that action is founded."

3d. If considered as a tacit ratification, all the authorities concur that all the facts and circumstances must be fully and completely known, and that the act relied on as a tacit ratification can be susceptible of no other interpretation. Rivas's Heirs *v.* Bernard, 13 Louisiana R. 175, and authorities there cited ; Copeland *v.* Mickie, 17 ibid. 293 ; 2 Solon, p. 370 ; Perrin, Traité des Nullités, p. 350.

16. The defendants also rely, in their printed argument, on the prescription of five years, established by art. 3507 of the Code of 1825. This prescription was not pleaded by them. Had it been, the answer would be, that it applies, in terms, to " contracts, testaments, and other acts," like art. 204, p. 303, of the Code of 1808 ; and that it does not extend to cases of fraud, which are exclusively provided for in the last-mentioned article.

17. If the case be tested by the rules of chancery, the resale would be the same.

In chancery, a purchase by a trustee can be cured by lapse of time.

The cases on this subject are nowhere better reviewed than in Kane *v.* Bloodgood, 7 Johns. Ch. Rep. 90. But the statute of limitations begins to run only from the open disavowal of the trust.

In this case, the possession was not known to the heirs to be adverse to the trust, except from the time when they were informed that the sales to Laignel and St. Felix were simulated. Until then, they believed the executors to be, as the executors pretended themselves to be, *bonâ fide* purchasers from Laignel and St. Felix, who, it was believed and represented, were themselves serious purchasers from the estate.

The courts of the United States, sitting as courts of equity, apply the statutes of limitations of the respective States. 6 Peters, 291 ; 16 Peters, 455, 495 ; 11 Peters, 369, 393, 406.

When the statute limits not at law, the same length of time is not a bar in equity. Boone *v.* Chiles, 10 Peters, 177 ; Cook *v.* Ankam, 6 Cond. Rep. 287 ; Baker *v.* Whiting, 3 Sumner, 486.

" In a case of trusts of lands, nothing short of the statute peri-

od which would bar a legal estate or right of entry would be permitted to operate in equity as a bar of the equitable estate." Judge Story, in Baker *v.* Whiting, 3 Sumner's Rep. 486.

It has been seen that no other prescription but that of thirty years would, by the law of Louisiana, bar the action of revendication.

Nothing is better settled, in the law of chancery, than that, in cases of fraud, the statute of limitations does not begin to run until a full discovery of the frauds practised. Boone *v.* Chiles, 10 Peters, 223 ; Aylward *v.* Kearney, 2 Ball & Beat. 476 ; Murray *v.* Palmer, 2 Sch. & Lef. 486 ; Hovenden *v.* Lord Annesley, 2 Sch. & Lef. 632 ; Bond *v.* Hopkins, 1 Sch. & Lef. 413 ; 1 Hovenden on Frauds, 480 ; Croft *v.* Adm'rs of Townsend, 3 Dess. 239 ; Wamburzee *v.* Kennedy, 4 Dess. 474, 485, 489 ; Randall *v.* Errington, 10 Ves. 423.

And vague rumors and reports do not constitute that kind of knowledge of the fraud which will give course to the statute of limitations. Flagg *v.* Mann, 2 Sumner, 491, 551, 563 ; Irby *v.* M'Crae, 4 Dess. 431 ; Randall *v.* Errington, 10 Ves. 423 ; 11 Louisiana R. 139 ; Conway *v.* Williams's Adm'r, 10 ibid. 568 ; Tyson *v.* McGill, 15 ibid. 145.

The acquiescence and ratification of two of the complainants is attempted to be inferred from their receipts. These parties assuredly knew nothing of the frauds of the executors when they signed the receipts, and acted with blind confidence. In equity, as long as the injured party does not know the full extent of his rights, and that the transaction is impeachable, any act done by him subsequently will not amount to a ratification or confirmation. As long as the dependence of the *cestui que trust* upon the trustee and the fiduciary relation continues, an alleged ratification will always be scrutinized with the utmost jealousy ; and a party possessing only imperfect information cannot be held guilty of laches. 1 Story's Equity, § 345 ; Butler *v.* Haskell, 4 Dess. 651, 709 (where the principal cases are reviewed); Murray *v.* Palmer, 2 Sch. & Lef. 486 ; 1 Hovenden on Frauds, 152, 484 ; Purcell *v.* McNamara, 14 Ves. 107, 120 ; Cole *v.* Gibbons, 3 P. W. 293 ; Brooke, Ex'r, *v.* Gally, 2 Atkyns, 34 ; Cole *v.* Gibson, 1 Ves. sen. 507 ; Taylor *v.* Rockfort, 2 Ves. sen. 281 ; Roche *v.* O'Brien, 1 Ball & Beat. 230 ; Morse *v.* Royall, 12 Ves. 364 ; Wood *v.* Downes, 18 Ves. 120.

Mr. Justice WAYNE delivered the opinion of the court.

The conclusions to which we have come in this cause do not require from us any comment upon its facts.

We concur with the learned judge in the Circuit Court, in setting aside the purchases by which Nicholas Girod and Jean François Girod became the possessors of their testator's entire estate.

But the morality and policy of the law, as it is administered in courts of equity, induce us to add, that those purchases were fraudulent and void, and may be declared to be so, without any further inquiry, upon the ground that they were made by the intervention of persons who were nominal buyers of the property for the purpose of conveying it to the executors. Such a transaction carries fraud upon the face of it. Lord Hardwicke *v.* Vernon, 4 Ves. jun. 411 ; 14 Ves. jun. 504 ; 2 Bro. C. C. 410, note. It matters not, in such a case, whether the sales are made with or without the sanction of judicial authority, or with ministerial exactness. The rule of equity is, in every code of jurisprudence with which we are acquainted, that a purchase by a trustee or agent of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not,—— *per interpositam personam*, —carries fraud on the face of it. In this instance, Laignel and St. Felix were the instruments of the executors. They bid off the property, paid nothing, received titles, and conveyed what they nominally bought to the executors. In this way Nicholas Girod became the purchaser of all the testator's property in New Orleans, and himself and his brother Jean François, the other executor, were joint purchasers of the lands and slaves in the parish of Assumption, and of the testator's lands elsewhere. Jean François, some years afterwards, sold out his half of their joint purchase to Nicholas, for seventy thousand dollars. Thus the latter became the possessor of the entire estate, and held it until he died, to the exclusion of all the other testamentary heirs. Some of those heirs, and the representatives of others of them, now sue the representatives of Nicholas Girod, and seek to set aside the purchases of the executors. They allege that they were fraudulently made, ask that they may have assigned to them their respective portions of the estate, with an account of rents and profits, excepting from their claim for the latter the moiety which had been received by Jean François Girod. The defendants reply, and deny fraud in fact or in intention on the part of the executors. They declare, that the sales were judicially ordered and conducted, that the purchases were rightfully made, for a fair price, at public auction, that the complainants have no standing in a court of equity by reason of their long silence, laches, and acquiescence in the acts of which they complain, and that their rights are barred by lapse of time, under the laws of Louisiana. They also say, that receipts or acquittances were given to the executors by two of the complainants, which are valid and obligatory upon them. The bill and answers, and the arguments of the learned counsel for the appellants, then, involve the question of the right of executors to purchase any part of the estate which they administer, for a fair price, at a public sale judicially ordered and conducted. Remarking, first, that an executor or administra-

tor is in equity a trustee for heirs, legatees, and creditors, we proceed to give our opinion of the law in respect to purchases of the estate represented by them, and of purchases made by other trustees and agents, and all persons *qui negotia aliena gerunt.* The rule as to persons incapable of purchasing particular property except under particular restraints, on account of the rules of equity, is compendiously given, by Sir Edward Sugden, in his second section of purchases by trustees, agents, &c. It has been adopted by almost every subsequent writer, and we cite the passage with confidence, having verified its correctness by an examination of all the cases cited by him ; by an examination, also, of other cases in the English courts, and of cases in the courts of chancery of several of the States in our Union, sustaining the doctrine, to the fullest extent, of the incapability of trustees and agents to purchase particular property, for the sale of which they act representatively, or in whom the title may be for another. He says, — " It may be laid down as a general proposition, that trustees, — unless they are nominally such to preserve contingent remainders, — agents, commissioners of bankrupts, assignees of bankrupts, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, or any persons who, by their connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restraints which will shortly be mentioned. For if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying upon their integrity. The characters are inconsistent. *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*" 2 Sugd. Vendors and Purchasers, 109, London ed., 1824.* The principle has been extended to a purchase by an

---

* *Trustees.* — Fox v. Mackreth, 2 Bro. C. C. 400 ; 4 Bro. P. C. (Tomlins's) 258; Hall v. Noyes, 3 Bro. C. C. 483, and see 3 Ves. jun. 748; Kellick v. Flexny, 4 Bro. C. C. 161 ; Whitcote v. Lawrence, 3 Ves. jun. 740 ; Campbell v. Walker, 5 Ves. jun. 678, and Whiteckre v. Whitackre, Sel. Chan. Cases, 13.

*Remainders.* — See Parks v White, 11 Ves. jun. 226.

*Agents.* — York Buildings Company v. Mackenzie, 8 Bro. P. C. 42 ; Lowther v. Lowther, 13 Ves. jun. 95 ; see Watt v. Grove, 2 Sch. & Lef. 492 ; Whitcomb v. Minchin, 5 Madd. 91 ; Woodhouse v. Meredith, 1 Jac. & Walk. 204.

*Commissioners of Bankrupts.* — Ex parte Bennet, 10 Ves. jun. 381 ; Ex parte Dumbell, Aug. 13, 1806, Mont., notes, 33, cited ; Ex parte Harrison, 1 Buck, 17.

*Assignees of Bankrupts.* — Ex parte Reynolds, 5 Ves. jun. 707 ; Ex parte Lacey, 6 Ves. jun. 625 ; Ex parte Bage, 4 Madd. 459 ; Ex parte Badcock, 1 Mont. & Mac. 231.

*Solicitors to the Commission.* — Owen v. Foulkes, 6 Ves. jun. 630, note b ; Ex parte Linwood ; Ex parte Churchill, 8 Ves. jun. 343, cited ; Ex parte Bennet, 10 Ves. jun. 381 ; Ex parte Dumbell, Aug. 13, 1806, Mont., notes, cited ; see 12 Ves. jun. 372 ; 3 Mer. 200.

*Auctioneers, creditors consulted as to mode of sale, or any persons who by their connection with, or concern in, the affairs have acquired a knowledge, &c.* — See Ex parte Hughes, 6 Ves. jun. 617 ; Coles v. Trecothick, 9 Ves. jun. 234 ; 1 Smith's Rep. 233 ; Oliver v. Court, 8 Price, 127.

attorney from his client whilst the relation subsists. Bellew *v.* Russell, 1 Ball & Beatty, 96 ; 9 Ves. jun. 296 ; 13 Ves. jun. 133. As to gifts. Lord Selsey *v.* Rhoades, 2 Sim. & Stu. 41 ; Williams *v.* Llewellyn, 2 You. & Jer. 68 ; Champion *v.* Rigby, 1 Russ. & Myl. 539. Nor can an arbitrator buy up the unascertained claims of any of the parties to the reference. Blennerhasset *v.* Day, 2 Ball & Beatty, 116 ; Cane *v.* Lord Allen, 2 Dow, 289. Where a person cannot purchase the estate himself, he cannot buy it as agent for another. 9 Ves. jun. 248 ; Ex parte Bennet, 10 Ves. jun. 381.

The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private ; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes. It acts not on the possibility, that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells. 2 Burge's Comm. 459. Cases have been frequently decided in the courts of Louisiana, which maintain the rule in all its integrity. In Pennsylvania it is enforced, though, on looking over its reports, we find a case, but unsustained by any reference to adjudged cases, in which it is said that an executor might buy at a sale of the testator's effects, if he did so for a fair price, at public auction. In Maryland, the courts of chancery carry out the rule to the fullest extent of the principles upon which it is founded, and as they have just been stated by us. In the case of Wormley *v.* Wormley, 8 Wheat. 421, this court declared, that no rule is better settled, than that a trustee cannot become the purchaser of the trust estate. He cannot be, at the same time, vendor and vendee. It had been previously ruled, in the case of Prevost *v.* Gratz, 6 Wheat. 481, and this court afterwards, in Ringo et al. *v.* Binns et al., reaffirmed the rule, by its application to an agent who had bought land to which

his principal was in equity entitled.   It said, "⸲ The proposition laid down by⸴ this court is, that if an agent discovers a defect in the title of his. principal to land,. he cannot misuse it to acquire a title for himself; and if. he does, that he will be held as a trustee holding for his principal."   10 Pet. 269, 281.   See also the case.of Oliver *v.* Piatt, 3 How. 333.   It is also affirmed, in Church *v.* Marine Insurance Company, 1 Mason, 341, that an agent or trustee cannot, directly or indirectly, become the purchaser of the trust property which is confided to his care.   We scarcely need add, that a purchase by a trustee of his *cestui que trust, sui juris,* provided it is deliberately agreed or understood between them that the relation shall be considered as dissolved, " and there is a clear contract, ascertained to be such, after a jealous. and scrupulous examination of all the circumstances, and it is clear that the *cestui que trust* intended that the trustee should buy, and there is no fraud, no concealment, and no advantage taken by the trustee of information acquired by him as trustee," will be sustained in a court of equity. But it is difficult to make out such a case, where the exception is taken, especially when. there is any inadequacy of price, or any inequality in the bargain.   Coles *v.* Trecothick, 9 Ves. 246 ; Fox *v.* Mackreth, 2 Bro. Ch. R. 400 ; Gibson *v.* Jeyes, 6 Ves. 277 ; Whichcote *v.* Lawrence,. 3 Ves. 740 ; Campbell *v.* Walker, 5 Ves. 678 ; Ayliffe *v.* Murray, 2 Atk. 59.   And therefore, if a trustee, though strictly honest, should buy for himself an estate from his *cestui que trust,* and then should sell it for more, according to the rules of a court of equity, from general policy, and not from any peculiar imputation of fraud, he would be held still to remain a trustee to all intents and purposes, and not be permitted to sell to or. for himself.   1 Story's Com. on Equity (2d ed.) 317 ; Fox *v.* Mackreth, 2 Bro. Ch. R. 400 ; S. C., 2 Cox, 320, 327,

In New York there has been no relaxation of it, since the decision in the case of Davoue *v.* Fanning, 2 Johns. Ch. 252.   It is a critical and able review of the doctrine, as it had been applied by the English courts of chancery from an early day, and has been received, with very few exceptions, by our State chancery courts, as altogether putting the rule upon its proper footing.   Indeed, it is not too much to say, that it has secured the triumph of the rule over all qualifications and relaxations of it in the United States, to the same extent that had been achieved for it in England by that great chancellor, Lord Eldon.   Davoue *v.* Fanning was the case of an executor for whose wife a purchase had been made by one Hedden, at public auction, *bonâ fide,* for a fair price, of a part of the estate which Fanning administered, and the prayer of the bill was, that the purchase might be set aside, and the premises resold.   The case was examined with a special reference to the right of an executor to buy any part of the estate of his testator.   And it was affirmed, and we think rightly, that if a trustee, or person acting for others, sells the

trust estate, and becomes himself interested in the purchase, the *cestuis que trust* are entitled, as of course, to have the purchase set aside, and the property reëxposed to sale, under the direction of the court. And it makes no difference in the application of the rule, that a sale was at public auction, *bonâ fide*, and for a fair price, and that the executor did not purchase for himself, but that a third person, by previous arrangement with the executor, became the purchaser, to hold in trust for the separate use and benefit of the wife of the executor, who was one of the *cestuis que trust*, and who had an interest in the land under the will of the testator. The inquiry, in such a case, is not whether there was or was not fraud in fact. The purchase is void, and will be set aside at the instance of the *cestui que trust*, and a resale ordered, on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the court. We are aware that cases may be found, in the reports of some of the chancery courts in the United States, in which it has been held that an executor may purchase, if it be without fraud, any property of his testator, at open and public sale, for a fair price, and that such purchase is only voidable, and not void, as we hold it to be. But with all due respect for the learned judges who have so decided, we say that an executor or administrator is, in equity, a trustee for the next of kin, legatees, and creditors, and that we have been unable to find any one well considered decision, with other cases, or any one case in the books, to sustain the right of an executor to become the purchaser of the property which he represents, or any portion of it, though he has done so for a fair price, without fraud, at a public sale. Why should the rule be relaxed in the case of persons most frequently exposed to the temptations of self-interest, who may yield to it more readily than any others, with a larger impunity, if the day of equitable retribution shall ever come for those who have been defrauded ? Is it not better that the cause of the evil shall be prohibited, than that courts of equity shall be relied upon to apply the remedy in particular cases, by inquiring into all the circumstances of a case, whether there has or has not been fraud in fact ? Is the rule to be relaxed, in the case of executors, in respect to all persons interested in the estate, or only to such of them as are *sui juris* ? And if only to those who are *sui juris*, why in case of an executor as to such persons, when the rule has never been relaxed by any court of equity to permit purchases by any other trustee or agent of one who is *sui juris* ? Shall it be relaxed in cases of those who are interested in the estate, and who are not *sui juris* or minors ? Then other remedies must be devised to protect their interests than that which experience has shown to be alone efficacious. It is, that when a trustee for one not *sui juris* sees that it is absolutely necessary that the estate must be sold, and he is ready to give more for it than any one else, that a bill should be filed,

uu*

and he should apply to the court by motion, to let him be a purchaser. This is the only way he can protect himself. There are cases in which the court will permit it. Campbell *v.* Walker, 5 Ves. jun. 478 ; 13 Ves. jun. 601 ; 1 Ball & Beatty, 418.

Such is the proceeding adopted in Louisiana, when property in which a minor is interested is offered for sale, as may be seen by the case in 5 Louisiana R. 16, McCarty *v.* Steam Cotton Press Company et al. The property was sold at auction, and the mother of the minor became the purchaser. It was contended that this purchase was null and void, because the property had descended to the children immediately after the death of the father, and the mother, who, by the effect of the law, was their natural tutor, could not buy it. The court said it was a general rule. But it having been shown that the mother and purchaser had petitioned the Court of Probates for a ratification of the sale, and that the court had ratified it upon the advice of a family meeting, the sale was confirmed. And the court held, that under the Spanish law (20) a tutor could purchase the property of his ward, with the permission of the judge.

We have said more upon the relaxation of the rule in the case of executors than we would have done, if the learned counsel for the appellants had not pressed, as an exemption from the rule, purchases made by executors without fraud at open sale, especially when by the will they were empowered to sell the estate of their testator for the benefit of heirs and legatees, and were heirs or legatees themselves. And if it had not been urged, that the decisions of the Supreme Court of Louisiana were unsafe guides in interpreting the Spanish laws in respect to the incapacity of persons to purchase at judicial sales particular property, on account of the official or financiering relation in which they stood to the persons who owned the property. It was supposed that the qualifications of the rule by the civil law embraced executors, or might do so by the reason upon which those qualifications were sustained. It imposes upon us the task of showing, that the relaxations of the rule by the civil law were never permitted by the Spanish law which prevailed in Louisiana, and were never extended under the civil law, to permit the executor *testamentarius* or executor *dativus* to buy the property which he was appointed to administer. It is a subject of curious and instructive examination to trace the rule or prohibition, in the course of its application under the jurisprudence of different nations. In all of them, there were limited and occasional relaxations of the rule in particular cases, in what are sometimes called hard cases, but in no one nation have purchases by executors been permitted, as a relaxation of the civil law rule. For a general historical examination of the subject, we have not time ; we wish we had. A brief examination, however, of the qualifications of the rule by the civil law will not be inappropriate upon an appeal from a court held in Louisiana, where the civil

law exists in a modified form, and is still often the rule of decision by its enlightened jurists.    The prohibition of the civil law is thus expressed : — " Tutor rem pupilli emere non potest ; idemque porrigendum est ad similia, id est, ad curatores, procuratores, et qui negotia aliena gerunt." Dig., Lib. 18 tit. 1, l. 34.; Inst., Lib. 1, tit. 21, 23.

The rule as expressed embraces every relation in which there may arise a conflict between the duty which the vendor or purchaser owes to the person with whom he is dealing, or on whose account he is acting, and his own individual interest.    Nor was it ever relaxed or qualified by the civil law, further than to allow the guardian to purchase the property of the ward, *palam et bonâ fide,* at public auction.    " Cum ipse tutor nihil ex bonis pupilli, quæ distrahi possunt, comparare palam et bonâ fide prohibetur ; multo magis uxor ejus hoc facere potest." Cod., Lib. 4, tit. 38, l. 5. But foreseeing the mischief which might grow out of the relaxation, it required that the purchase must be made by the guardian himself, *palam et bona fide,* and not *per interpositam personam.*    " Sed si per interpositam personam rem pupilli emerit, in eâ causâ ut emptio nullius momenti sit, quia non bonâ fide videtur rem gessisse.    Et ita es\ rescriptum a D. Severo et Antonino." Dig., Lib. 26, tit. 5, l. 5, § 3.    A purchase by a guardian from his co-guardian was permitted, if it took place in public, and *bonâ fide.*    " Item ipse tutor et emptoris et venditoris officio fungi non potest.    Sed enim si contutorem habeat, cujus auctoritas sufficit, procul-dubio emere potest. Sed si malâ fide emptio intercesserit, nullius erit momenti, ideoque nec usucapere potest.    Sane; si suæ ætatis factus comprobaverit emptionem, contractus valet." Dig., Lib. 26, tit. 8, l. 5, § 2.

The guardian might purchase at a sale made at the suit of a creditor.    " Si creditor pupilli distrahat, æque emere bonâ fide poterit." Dig., Lib. 26, l. 5, § 5.    Such is the extent of the qualification of the rule of the civil law.    And, its limitation not being well understood, persons have often been misled to apply it to what they supposed to be analogous agencies, such as executors, when there was no authority either in the text of the civil law, or in the practice under it, for doing so.    But, further, those qualifications of the rule mentioned were confined in practice to those territories in Europe in which the civil law prevailed without modification. And it is remarkable, considering what were the influences upon Christendom of the civil law, after its discovery in the twelfth century, — and when not until some time after it began to be used as a rule of law by which public and private rights were determined, — when in the fifteenth and sixteenth centuries it was the study of the wisest men, — it is remarkable that the qualifications of the rule, as they have been stated, were considered imperfections, and were rejected by every nation in Europe whose codes are generally admitted to have been compiled from the civil law, with an intimate

knowledge of human nature, as it has always shown itself in the business of life. Here, appropriate to what has been just said, is the language of Pothier. " Nous ne pouvons acheter, ni par nous-mêmes, ni par personnes interposées, les choses que font partie des biens dont nous avons l'administration ; ainsi un tuteur ne peut acheter les choses qui appartiennent à son mineur ; un administrateur ne peut acheter aucune chose de bien dont il a l'administration." Tr. du Contrat de Vente, part. 1, n. 13. The rule of the civil law, without qualification, is adopted in the codes of Holland. " Quæ vero de tutoribus cautâ, ea quoque in curatoribus, procuratoribus, testamentorum executoribus, aliisque similibus, qui aliena gerunt negotia, probanda sunt." Voet., Lib. 18, tit. 1, n. 9 ; 2 Burge's Comm. 463. In Spain, the rule was enforced without relaxation, and with stern uniformity. Judge McCaleb cites in his opinion, from the Novissima Recopilacion, the rule, in the following words. " No man, who is testamentary executor or guardian of minors, nor any other man or woman, can purchase the property which they administer, and whether they purchase publicly or privately the act is invalid, and on proof being made of the fact, the sale must be set aside." This was the law of Louisiana when the executors in this instance made their purchases, and it is conclusive of the invalidity.

We have thus shown, that those purchases are fraudulent and void, from having been made *per interpositam personam,* and if they were not so on that account, that they are void by the rule in equity in the courts of England, and as it prevails in the courts of equity in the United States. It has also been shown, that they are void by the law of Louisiana, as it was when they were made by the executors, and that such purchases never were countenanced in that State by any qualification of the civil law rule prohibiting purchases by those who stood in such fiduciary relations to others ; that the act could not be generally done, without creating a conflict between self-interest and integrity. In every aspect in which we have viewed this case, we are called upon to direct that the purchases made by Nicholas and Jean François Girod of their testator's estate should be set aside. We shall order it to be done. Nor do we think that the complainants have lost their rights by negligence, or by the lapse of time. We can only see in their conduct the fears and forbearance of dependent relatives, far distant from the scene of the transactions of which they complain, desirous of having what was due to them, and suspecting it had been withheld, but unwilling to believe that they had been wronged by brothers, with whom they had been associated in a common interest by another brother who was dead. In a case of actual fraud, courts of equity give relief after a long lapse of time, much longer than has passed since the executors, in this instance, purchased their testator's estate. In general, length of time is no

bar to a trust clearly established to have once existed ; and where fraud is imputed and proved, length of time ought not to exclude relief. Prevost *v.* Gratz, 6 Wheat. 481. Generally speaking, when a party has been guilty of such laches in prosecuting his equitable title as would bar him if his title were solely at law, he will be barred in equity, from a wise consideration of the paramount importance of quieting men's titles, and upon the principle that *expedit reipublicæ ut sit finis litium* ; although the statutes of limitations do not apply to any equitable demand, courts of equity adopt them ; or at least generally take the same limitations for their guide, in cases analogous to those in which the statutes apply at law. 10 Ves. 467 ; 1 Cox, 149. Still, within what time a constructive trust will be barred must depend upon the circumstances of the case. Boone *v.* Chiles, 10 Peters, 177. There is no rule in equity which excludes the consideration of circumstances, and, in a case of actual fraud, we believe no case can be found in the books in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or becomes known to the party whose rights are affected by it. In this case, that time has not elapsed since the executors made their purchases, and it is not pretended that they were known to any of the complainants until the year 1817, and not then, except by the exhibition of an account by the executors to some of the complainants, with declarations that every thing had been fairly done with a view to save the honor of the testator, and the interests of those who were the objects of his bounty. In this view of the case, it is not necessary for us to consider the time within which remedies are barred, or property may be acquired by prescription, under the laws of Louisiana. We would willingly otherwise do so, for the result would show the same harmony in the application of the rules of the civil law and those of Louisiana upon prescription with the rules prevailing in courts of equity in England and the United States, as we trust has been shown to exist between them in the prohibition of an executor to buy the estate of his testator.

The receipts or acquittances given by two of the complainants to the executors do not affect their rights. They were obviously given without full knowledge of all the circumstances connected with the disposal and management of the estate. Indeed, it is plain that such information had been withheld by the executors. It is true that an account was presented to them, with official signatures to it, but without vouchers of any kind to verify its correctness, and it was accompanied by a letter from Nicholas Girod, in which menaces of displeasure are mingled with intimations of future kindness.

We shall also direct the official proceedings which were had

upon the account of Nicholas Girod, against the estate of Claude, to be set aside and annulled. But there will be allowed to the representatives of Nicholas, in the settlement of the estate, the sum of $ 6,574·20, with interest at five per cent. The proofs in the cause show that, a few months before the death of the testator, there had been a settlement of accounts between him and Nicholas, and we allow that amount, as it is charged in the general account, disallowing all the other items. We suppose it to be an inadvertency in drawing up the decree, that the sum just mentioned was not allowed, as the learned judge, in his opinion, states that a settlement had taken place, with that result.

We shall also direct that the actual cost of all permanent improvements which were made upon any part of the estate by Nicholas Girod shall be allowed to his representatives, with interest at five per cent. in the settlement which shall be made with the complainants and the other persons having an interest under the will of Claude. And also an allowance for taxes, and the expenses and cost paid in recovering the property gained by alluvion. A reference to a master will be directed. We regret to perceive from the record, that all the persons who are interested in the estate of Claude F. Girod are not parties to this proceeding. We shall direct, that they shall be permitted to make themselves parties, if they please to become so. But in giving the order, it is not intended to delay those from receiving their portions in whose behalf this decree is made. The fruits of their vigilance can be apportioned according to their respective rights in the estate, when one of the original testamentary heirs claims, and the Circuit Court, in the further proceedings in the cause under the mandate of this court, will of course take care to ascertain who are the representatives of others of them who are dead.

Jean François Girod is not a party in this cause, and therefore we can give no decree against him, but should he offer to become a party for the purpose of claiming what under the will was his portion of the estate of Claude, or should it be claimed by any representative of his, we think it right to remark, for the purpose of preventing further litigation in this matter, that such claim will be subject to all the equities subsisting between Jean François and Nicholas, and especially to the allowance to the representatives of Nicholas of the purchase money which was given by Nicholas to Jean, for the one half of their joint purchase of the property of their testator, with interest at the rate according to their contract up to the times when the purchase money was paid, and afterwards at five per cent.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern Dis-

Michoud et al. *v.* Girod et al.

trict of Louisiana, and was argued by counsel. Whereupon it is considered by the court, —

1. That the plaintiffs are residuary legatees of Claude Francois Girod, deceased, in the following proportion, namely : Peronne Bernardine Girod, the widow of Jean Pierre Hector Pargoud, for one eighth ; Rosalie Girod, the widow of Louis Adam, for one eighth ; Françoise Peronne Quitand, the wife of J. A. Allard, for one forty-eighth ; Marie Philippine Rose Quitand, for one forty-eighth ; Marie Bernard Quitand, for one forty-eighth ; Louis Joseph Poidebard, for one forty-eighth ; Benoite Colline Nicoud, for two two-hundred-and-eighty-eighths ; Maurice Emilie Nicoud, and Jenny Benoite Nicoud, represented by Jean Berger, their tutor, each for two two-hundred-and-eighty-eighths ; Jean François Girod, the nephew, in his own right, and as testamentary heir of Pierre Nicholas Girod, his brother, and represented by Jean Firman Pepin, the syndic of his creditors, for one twentieth ; and Françoise Clementine Girod, wife of Pierre Francois Pernond, for one fortieth.

2. That the adjudication of landed property, with the slaves thereto attached, situated on Bayou Lafourche, made on the 18th of February, 1814, to Charles St. Felix ; the retrocession of said property by said Charles St. Felix to Nicholas and Jean François Girod, on the 23d of February, 1814 ; the adjudication of the property situated in the parish of Orleans made to Simon Laignel on the 9th of April, 1814, and the notarial seal made to the same on the 26th of April, 1814, in pursuance of said adjudication ; and the conveyance of said property to Nicholas Girod, of the 28th of April, 1814, be set aside and annulled, saving, however, the just rights of third persons, to whom two tracts of land on Bayou Lafourche, two slaves, and a piece of ground in the city of New Orleans were conveyed by the said Nicholas Girod in his lifetime, as appears from the admissions in the pleadings.

3. That for the purpose of giving to the residuary legatees of the late Claude François Girod their proportions respectively of the estate of the testator, the said Circuit Court should direct either a sale of the said property, both real and personal, at such time and manner as said court shall see fit, or cause a partition in kind to be made of said property, as in the judgment of the said court might be deemed most advisable ; and that in either case the said court should direct all the proper conveyances to be made accordingly.

4. And for greater certainty it is hereby declared, that the property, of which undivided portions are to be conveyed and assigned to the plaintiffs as aforesaid, is all the property and slaves which were inventoried in the parishes of Ascension, Assumption, and Lafourche Interior, after the death of said Nicholas Girod, as belonging to his estate ; and all the property which was inventoried after the death of said Nicholas Girod, as situated in the Municipal-

ity No. 2 of the city of New Orleans, including the property which is an alluvion, and accessory to the property derived from the estates of Claude Frânçois Girod, and which was abandoned to Nicholas Girod by the heirs of Bertrand Gravier, by an act of compromise executed on the 29th day of March, 1823, and also the house and lot situated at the corner of St. Louis and Chartres Streets, in Municipality No. 1 of the city of New Orleans.

5. That the adjudication made in the Parish Court of the Parish of Orleans, in the year 1815, in favor of Nicholas Girod, for $ 40,418·09, and claimed by the said Nicholas in the account filed in the Court of Probates by Nicholas and Jean François Girod, in May, 1817, be set aside, and instead thereof that the representatives of said Nicholas Girod be allowed, in the settlement of the accounts by the master in this cause, the sum of $ 6,576·20, with interest thereon at the rate of five per cent. per annum from the 1st day of August, 1813.

6. That the two acquittances and releases given, in 1817, by the plaintiffs, Madame Adam and Madame Pargoud, to Jean François Girod, be set aside, and be allowed no other force or effect than as acknowledgments of the receipt by Madame Pargoud for 5,242 francs 75 c., and by Madame Adam for the sum of 10,242 francs 75 c., making respectively the sum of $ 975·15, and $ 1,905·15, in the currency of the United States, as stated in said receipt; and that the said amounts should be deducted from their portions respectively in the distribution.

7. That a reference be made to a master in chancery to take an account of what is due from the estate of Nicholas Girod to the plaintiffs, on account of the property belonging to the estate of Claude François Girod, and alienated by said Nicholas Girod, for rents and profits, and for interest; and of what may be due by the complainants to the estate of Nicholas Girod, for payments made by the said Nicholas on account of the debts of the said Claude François Girod, and of the legacies paid by him, and of permanent improvements; and, in taking said account, said master shall charge the said estate with the value of the crop alleged to have been on hand, when the property in Lafourche was adjudicated to Charles St. Felix, with interest thereon; with the amounts which, by the aforesaid account of 1817, the said executors acknowledged to have received, or for which they consented to become responsible, from the time the same were received; with the price at which the two tracts of land on Bayou Lafourche and the two slaves were sold, and which are mentioned in the pleadings as having heretofore been sold, with interest thereon from the time when, according to the bill of sale, said price was payable; with the sum of thirty-five thousand dollars, this being the admitted value of the price of the ground donated by Nicholas Girod to the Female Orphan Asylum, with interest thereon from the time said donation was made; with the

rents and profits of the plantation and slaves, the house at the corner of Chartres and St. Louis Streets, and the property in Faubourg St. Mary, now called the Second Municipality, from the adjudication of 1814, and at the rate which might reasonably, and with a proper administration, have been obtained for the same, it being understood that from the years 1829 and 1830, when the property in Faubourg St. Mary, or Second Municipality, still undisposed of, was leased to John F. Miller, the rents and profits thereon are to be charged at the rate at which the rent was stipulated in the lease to said Miller.

8. And the said master shall credit the estate of Nicholas Girod, on said account, with the amount with which said executors credited themselves in their account of the 23d of May, 1817, with interest thereon, except the personal claim of $40,418·09, in lieu of which this court has directed the allowance of $6,576·30, being one of the items of the general account which was claimed by Nicholas Girod against Claude François Girod after the death of the said Claude, and the estate of Nicholas Girod shall be credited with any payments that have been made on account of legacies left by the said Claude, with interest thereon. And the estate of the said Nicholas Girod shall be credited with one half of the rents and profits of the plantation and slaves of Bayou Lafourche, up to the time when Jean François sold his interest in the same to Nicholas Girod. And the said master shall also credit the estate of the said Nicholas Girod with the actual cost in money expended by the said Nicholas in permanent improvements, still in existence, of or upon any part of the estate of Claude François Girod, including improvements of the property gained by alluvion, accessory to the property derived from the estate of Claude Francois Girod, which was abandoned to Nicholas Girod by the heirs of Bertrand Gravier, by an act of compromise, executed on the 29th of March, 1823, and the expenses and cost paid by him in recovering the alluvion before mentioned, and including also improvements on the lot at the corner of St. Louis and Chartres Streets, and with improvements on the lands on Bayou Lafourche, deducting from these last the value of the labor of the slaves on the said plantation aiding and making such improvements, and of the materials procured from the same. And the actual cost in money of all improvements made by said Nicholas shall be allowed, with interest at five per cent. upon the same from the time it shall be ascertained or found by the master that the sums were expended. And allowance is also to be made to the estate of said Nicholas for all taxes paid on the property of Claude François Girod. And the said master is hereby authorized, for the discovery of the matters aforesaid, to receive from the parties, upon oath, books, and papers, and writings in their custody and power relating thereto, and also to examine witnesses orally or upon written interrogatories, in regard to the cost

of all improvements, due notice of his proceedings in this matter being given to the parties or their attorney.

9. And the said master shall compute what amount of the balance so to be found against the estate of Nicholas Girod shall be paid to each of the plaintiffs, according to their declared proportionate interest in the estate of Claude François Girod, and said balance shall be paid to them, with interest from the date up to which the master's report may present a calculation of interest; and said payment shall be made by the dative testamentary executors of Nicholas Girod, out of the funds of said estate, in preference to any legacies under the will of said Nicholas Girod. And for the better discovery of matters aforesaid, the parties are to produce before the said master, upon oath, all books, papers, and writings in their custody or power relating thereto, as the said master shall direct. And the said master shall, when necessary, examine said parties upon written interrogatories.

10. That any other person or persons, not now parties to the proceedings, claiming title to the funds or estate in controversy, or to any part thereof, should be allowed to present their claims respectively before the said Circuit Court, to make due proofs thereof, and to become parties to the proceedings, for the due establishment and adjudication thereof. And that the costs of this suit which have hitherto accrued in the said court should be paid by the said dative testamentary executors out of the funds of said estate.

11. It is thereupon now here adjudged and decreed by this court, that so much of the decree of the said Circuit Court as conforms to the decree and opinion of this court be and the same is hereby affirmed. And that this cause be and the same is hereby remanded to the said Circuit Court, with directions to allow any person or persons not now parties and claiming title to any portion of the estate in controversy to become parties to the suit, to present their claims and make due proof thereof, and for such further proceedings to be had therein, in conformity to the decree and opinion of this court, as to law and justice shall appertain.